The State v. Wilbert Dilley, Appellant.—76 S. W. (2d) 1085.

Division Two, December 1, 1934.

76

*M. E. Pangburn* and *Davis & Davis* for appellant.

*Roy McKittrick*, Attorney General, and *Frank W. Hayes*, Assistant Attorney General, for respondent.

ELLISON, P. J.—The appellant was convicted of grand larceny in the Circuit Court of Clay County and his punishment assessed

by a jury at two years' imprisonment in the State penitentiary. The charge was that he stole fifteen head of hogs of the value of $45 belonging to one Miller Howard. His motion for a new trial in the circuit court preserves only two assignments of error: (1) that there was no substantial evidence to support the verdict; (2) that the court erred in admitting certain testimony concerning his flight when approached by the officers at the time of his arrest. These points have been briefed by his counsel in this court.

Mr. Howard had twenty small red shoats weighing about seventy pounds each, on a farm near the northwest corner of Clay County. He last saw them on Sunday, January 22, 1933. The following day he had them vaccinated by a man named Lingenfelter but was not present at the time. There is no evidence that the hogs were seen by anybody the next day, Tuesday; but on Wednesday, January 25, when Howard went to the farm fifteen of the shoats were missing. He immediately began an investigation which developed that on that same day the fifteen shoats had been sold by a man named Earl Douglas to a man named Elmer Reed who lived in the northwest part of Daviess County more than fifty miles away.

The appellant, Dilley, also lived in the northwest part of Daviess County near Pattonsburg, as did another man named Harry Nance. Mr. Nance testified that about an hour and a half after sunrise on the Wednesday morning aforesaid the appellant and Douglas drove out to his farm about five miles south of Pattonsburg. The defendant introduced Douglas to Nance giving his name as Brown. They had eight head of the hogs in the back part of an automobile coupe and said they had some others they had not brought with them. There is no evidence as to which of the two men owned or controlled the automobile. Continuing, in answer to the prosecuting attorney's question as to what "they" said, this witness Nance testified concerning the statements then and there made by the appellant and Douglas, as follows:

"A. They wanted to know of me if I wanted to buy some stock hogs and told them I did, and so they said they started to St. Joe with fifteen head of stock hogs on a trailer and it broke down between Winston and Cameron and didn't hardly know what to do with them, so they loaded about half of them on this car and started back to the farm with them, and so we let them out of the car and I traded on these and they said they would go back and get the others, and while they were letting eight pigs out of the car, one of the boys said 'I have got about forty more I want to sell.' I says 'What do you want for them?' 'Well,' he says, 'I am not ready to sell them yet.' "

Mr. Nance said Douglas and the appellant left and returned in about an hour with the other seven pigs and unloaded them at his farm. All the hogs were weighed and then Nance went to his house

to write a check in payment for the hogs. He asked Douglas, or "Brown" what his given name was and the latter replied "John." Nance then asked him where he lived and Douglas replied he lived about eight miles north of Coffey, which is a small town in the north part of Daviess County. When Mr. Nance went into the house to write out the check he telephoned the banker at Coffey and asked him if he knew a John Brown living eight miles north of there and the banker said he did not. So when Nance returned to the yard where the appellant and Douglas were waiting, he told them of his conversation with the banker and asked Douglas to give him some references he could call up. Douglas said he had lived in the neighborhood of Coffey only about eight months and hadn't got acquainted much and didn't have a telephone. Nance then named two or three men living in the neighborhood of Coffey but Douglas didn't know any of them. So Nance said he would meet them in Pattonsburg later in the morning and if they could find some one who would identify "Brown" he would pay for the hogs. Douglas and Nance did meet in Pattonsburg later the same morning, and the former made further unsuccessful attempts to satisfy Nance that he was John Brown and lived near Coffey. The sale was called off and Douglas said they would go out to the farm and get the hogs. The appellant was not present during any of the conversations in Pattonsburg.

Mr. Elmer Reed, who purchased the hogs, testified that on the same morning, about eleven thirty o'clock, the appellant asked him if he would buy a bunch of shoats. The witness says he replied that he would look at them after dinner and asked where they were. The appellant answered they were about three or four miles over south. After noon Reed says the appellant pointed out Douglas to him and said "there's the man that owns the hogs," but did not go with or introduce him to Douglas. Douglas brought the hogs into Pattonsburg in a truck, told Reed he owned them and said he had forty more about like them that he wanted to sell. Reed brought the fifteen hogs from Douglas, gave him a check for them, and Douglas delivered them at his farm. The appellant did not participate in the sale negotiations and the pay check was made out to Douglas alone.

Evidently some information concerning the appellant's connection with the sale of the hogs was communicated to the officers. At any rate on the following day, Thursday, Mr. Howard, the owner of the hogs, his son Carl Howard, Sheriff Pence of Clay County and his son, and Mr. Lingenfelter, who had vaccinated the hogs, all went up to Pattonsburg where they were joined by Sheriff Hutchinson of Daviess County and Constable H. B. Dilley, who was a third cousin of the appellant's. They drove out to the home of the appellant in the country in two automobiles. When they got within about an eighth of a mile of the house they had to stop because of a mudhole in the road.

Mr. Miller Howard, Constable Dilley and Sheriff Hutchinson, who were in the front one of the two cars, testified that at or about the time they reached the mudhole they saw the appellant come out in front of his house, and when their automobile stopped he went back into the house and ran out the entrance on the other side with his overcoat. He continued on south through the barn lot to a patch of timber about a fourth of a mile long and ran on through the timber. They followed him by his footprints until they came in sight of him and finally overtook him about three-fourths of a mile from his home. All these witnesses agreed that the appellant ran when he left the house and in his course through the timber, but he was walking when they overtook him. Constable Dilley said the appellant "had run about as far as he could run." The constable, who was sixty-three years old and was wearing an overcoat and a pair of heavy overshoes said he, too, was winded. Counsel for appellant argue in their brief that he couldn't have been making a serious effort to escape, else he would have outrun the old Constable with his heavy clothing in a three-quarter mile chase through the hills in a wooded country with a start of more than 200 yards. When the appellant was overtaken his only explanation of why he had left thus hurriedly was that he "went to town every day."

Sheriff Pence testified that after the appellant was arrested he said at one time he had known Earl Douglas for two or three years, and at another time said he had known him for about a year. This was all of the evidence for the State.

The appellant testified that he had lived around Pattonsburg all his life; that he was married and had a wife and a child seven years old. He denied that he stole the hogs or had anything to do with it, and denied that he introduced Douglas to the witness Nance as "Brown," and that he introduced him at all. However, he admitted that he went out to Nance's home with Douglas. He also denied that he had run when the officers and men went out to his house to make the arrest. Douglas, whom the record shows, also was charged with stealing the hogs, testified that to the best of his knowledge and belief the appellant did not steal them; and that he and the appellant were not together on January 24, 1933, the day on which the hogs were alleged to have been taken. He said the appellant never at any time claimed to own any of the hogs and did not receive any of the hogs and did not receive any money or thing of value for them. He also denied that the appellant introduced him to Nance as "Brown." He admitted having been convicted of a crime and serving a term in the penitentiary. No effort was made by the State to attack the character or credibility of the appellant.

We are driven to the conclusion that the appellant's first assignment is good—that is to say, that there is not sufficient sub-

stantial evidence to support the verdict and judgment. The State's evidence is wholly circumstantial, and the rule is familiar that "when a conviction for a felony rests altogether upon circumstantial evidence, . . . the circumstances proven must be consistent with each other, consistent with the hypothesis that the accused is guilty, and at the same time inconsistent with the hypothesis that he is innocent, and with every other rational hypothesis except that of guilt." [State v. Duncan, 330 Mo. 656, 661, 50 S. W. (2d) 1021, 1023.]

There is no evidence, direct or circumstantial, connecting the appellant with the actual larceny. By this we mean there was no showing that he took the hogs or that he was at or near the scene of the crime, about the time it was committed, and therefore had opportunity to commit it—he lived fifty miles away from there. If the verdict is to stand, it must rest on inferences drawn from the following facts: (1) that he went with Earl Douglas to the home of Mr. Nance the day after the hogs were stolen and participated in the unsuccessful attempt of Douglas to sell the hogs to Nance; (2) that later, on the same day, he asked Elmer Reed if he would buy a bunch of shoats, and shortly thereafter pointed out Douglas to Reed saying "there's the man that owns the hogs;" (3) that he fled when the officers approached his home to arrest him; (4) that he made contradictory statements to Sheriff Pence after he was arrested, stating at one time he had known Earl Douglas for two or three years, and at another time that he had known him for about a year.

First, as to the transactions with Nance and Reed. It is established law that the recent exclusive possession of stolen property will support an inference that the possessor was the thief; and the decisions say such possession need not be exclusively in the defendant but may be in him and another person jointly. Convictions have been sustained where the evidence showed both were in possession or that both asserted dominion over property in the possession of one of them, as by attempting to sell it. [State v. Prunty, 276 Mo. 359, 371, 208 S. W. 91, 94; State v. Burns, 263 Mo. 593, 599, 173 S. W. 1070, 1072; State v. Toohey, 203 Mo. 674, 679, 102 S. W. 530, 532.]

It is also true that when Mr. Nance was on the stand testifying about what occurred when the appellant and Douglas went out to his farm, and the prosecuting attorney asked him what "they" said and did he stated "they" told him they had started to St. Joseph with fifteen head of hogs on a trailer which broke down; that they had eight of the pigs with them in their coupe when they came to the farm and said they would go back and get the other seven, which they later did do.

This testimony, standing alone, probably would be sufficient to warrant an inference that the appellant was in possession of the hogs jointly with Douglas. But the facts taken as a whole, we think, nega-

tive such an inference. The further testimony of Mr. Nance was that *one* of the two men said "I have got about forty more I want to sell." (It was Douglas, not the appellant, who later that morning made the same statement to Mr. Reed.) There was no evidence as to who owned, controlled or drove the automobile. Also, the appellant, who lived in the same general neighborhood with Nance and whom Nance knew by sight but not by name, introduced Douglas to Nance as "Brown." Nance then asked "Brown" where he lived and he replied eight miles north of Coffey. Just before Nance went to the house to write a check in payment for the hogs he asked "Brown" what his given name was and the latter replied "John." Obviously the check was to go to "Brown" and not to the appellant. "Brown" was unable to satisfy Nance as to his identity so they went to Pattonsburg. There Douglas or "Brown" made further unsuccessful attempts to prove himself entitled to the purchase money, and, failing in these, he called the sale off. If any of the proceeds from the sale of the hogs had been intended to go to the appellant, it would have been an easy matter for Mr. Nance to have made the check out to the appellant, whom he knew at least by sight as a farmer of the neighborhood, rather than to let the transaction fall through because Brown could not give satisfactory proof of his identity. But the appellant took no part in the conversations or negotiations in Pattonsburg, all of which conclusively indicates to us that Brown was asserting exclusive dominion over the hogs.

As to the transaction with Reed. All the appellant did was to ask Reed if he would buy a bunch of shoats, and pointed out Douglas as the man who owned them. He did not participate in the sale negotiations, or receive any of the purchase price. Douglas brought the hogs into Pattonsburg on a truck, showed them to Reed, told him they were his and Reed bought them from him and paid him alone for them. Douglas delivered the hogs to Reed's farm. Certainly this wholly fails to show joint possession of the hogs in the appellant.

On the question of flight. It is stated in 16 Corpus Juris, section 1566, page 763 that "while flight of accused, or his resistance of arrest, is a circumstance to be considered against him, it is not conclusive, or even prima facie evidence, of his guilt; and indeed is insufficient of itself to support a conviction, when an explanation therefor consistent with innocence is given by accused."

The appellant in this case did not make a very satisfactory explanation of why he fled. According to Constable Dilley the only reason he gave was that "he went to town every day." But there is no evidence to show that the appellant recognized the men in the automobile as they drove up to the mudhole one-eighth of a mile away; there is no evidence that he knew he was charged or suspected of crime, and there is no evidence that he fled for the purpose of absenting or concealing himself. According to the story told by the

State's witnesses he simply started out on a run and went through the timber. He was out of sight of the officers during this time and they followed his tracks. When they came out on the other side of the timber and the appellant could see them he was walking on the railroad right of way and he made no effort to evade them.

Neither does the testimony of Sheriff Pence that the appellant at one time told him he had known Earl Douglas for two or three years and at another time that he had known him for about a year, have enough probative value to support the conviction. Indeed, we do not consider the statements are very contradictory, in view of their general nature and the fact that ''about a year'' is not very different from two years.

We think the evidence, considered as a whole is too weak to support a conviction and penitentiary sentence as against a man of previous good character, presumptively. Certainly, as a matter of law, it is not inconsistent with every reasonable hypothesis of the appellant's innocence of the larceny charged. To us it indicates, rather, that he was simply assisting Douglas in disposing of the stolen hogs. The facts were not developed on either side. Allowing for the possibility that the State may be able to produce additional evidence, the cause is reversed and remanded. All concur.