THE STATE v. GEORGE LONG, Appellant.—80 S. W. (2d) 154.

Division Two, March 5, 1935.

*Rendlen, White & Rendlen, James C. Dorian* and *J. C. Miller* for appellant.

632

*Roy McKittrick*, Attorney General, and *Frank W. Hayes*, Assistant Attorney General, for respondent.

WESTHUES, C.—Appellant was charged, by an information filed in the Circuit Court of Knox County, Missouri, with the crime of murder in the first degree. The first trial of the case resulted in a hung jury. The second trial resulted in the conviction of appellant of murder in the second degree with a punishment of thirty years' imprisonment in the penitentiary. He duly appealed from the sentence imposed.

Appellant and his wife lived on a farm located on the north side of an east and west road a few miles south of Hurdland, Knox County, Missouri. The deceased, Fay Oliver, lived with his wife and children about one-eighth of a mile east of appellant on the south side of the east and west road. On the afternoon of May 12, 1932, deceased was ploughing with the aid of a tractor in a field on the south side of the east and west road and about one-eighth of a mile west of appellant's home. When deceased failed to return home at the expected hour his wife became alarmed, fearing something might have happened to him while ploughing with the tractor. She, in company with her children, at about six-thirty P. M., walked to the field by way of the road. They found the tractor standing in the roadway, headed east, a short distance from the entrance and about one-eighth of a mile west of appellant's home. The lifeless body of Oliver was lying face downward a short distance west of the tractor near the center of the road. Mrs. Oliver turned the body over and found deceased had been shot. Appellant was arrested that same night and charged with the crime which resulted in his conviction as above stated.

Appellant's motion for a new trial covers forty-two pages of the brief. The transcript of the evidence is voluminous. One of the

points most strongly urged for a reversal is that the evidence was insufficient to sustain a conviction. This requires a close examination of the evidence and a full statement of the facts. We will attempt to make this statement as short as possible.

The State relied solely upon circumstantial evidence for a conviction. The evidence in substance is as follows: It disclosed that appellant and deceased had had trouble about six or seven years prior to the homicide. Shortly thereafter deceased and his family moved to Chicago where they resided about four years. A year or so prior to the homicide deceased and his family again took up their residence on the farm in Knox County. The evidence does not disclose any further trouble or quarrels between appellant and the deceased and they were apparently on friendly terms. The evidence disclosed that appellant, a number of years prior to the homicide, possessed a .38-caliber gun. A witness testified of having seen the gun in appellant's possession a few months prior to the homicide. A number of .38-caliber cartridges were found in a bureau drawer in appellant's home. A witness testified with reference to a threat made by appellant against deceased. The evidence as to this threat was rather meager and uncertain. On the evening of the homicide, after Mrs. Oliver had reported that her husband had been shot, a large number of people went to the scene of the murder. Numerous cars were parked both east and west in the public road. The coroner and sheriff were notified. A doctor, who was called, made a limited examination of the body and after the coroner arrived the body was taken to the Oliver home. A thorough examination revealed that deceased had been shot three times. One bullet entered the body in the back beneath the right shoulder, emerged on the left front side and evidently passed through the heart. The medical witnesses stated that from such a wound death would result either instantly or within a very short time. Another bullet struck deceased beneath the right ear and lodged near the right eye. This bullet was removed and found to be a .38-caliber steel jacket. The third entered the right arm. In the chest was found a stab wound which extended to a rib. A powder burn was discovered on the right side of the face. The shot wound in the right arm and the stab wound were, in the opinion of the doctors, inflicted after death. There was a growth of brush along the fence row on the south side of the road and east of the gateway leading into the field where deceased had been ploughing. A number of hours after the curious crowd had gathered a place was noticed near the fence where the weeds and grass had been pressed to the ground as though someone had been hiding there. Tracks were also noticed at this place. About twelve o'clock that night this place was guarded as the sheriff ordered. In response to a call a man named Fenton arrived the next morning with bloodhounds. A

dog named Dempsey was placed on the spot described. The dog went from there south into the field then back to the north side of the fence and west along the fence about one hundred and fifty feet or more then across the road to the north into appellant's land. After going north for some distance the dog turned east to the barn of appellant and thence to his home. At this point the dog was taken away. Appellant at this time was in the county jail.

Statements, alleged to have been made by appellant, which the State insists were incriminating, were related by a number of witnesses. On the night of the homicide, after a number of people had congregated at the scene of the murder, appellant arrived and is alleged to have asked: ''What is going on here?'' After the body was removed to the Oliver home, appellant rode from the scene to his home in a car with one Clata Dudgeon and a number of other people. Dudgeon testified to a conversation appellant had with him and another person at that time. Dudgeon's testimony reads as follows:

''A. He and Mrs. Mills and myself were in conversation and as they carried the body of Mr. Oliver by the car, I waited until they got past, why, he made the statement that he was deader than hell. After I got turned around and started back towards Oliver's home, why he and Mrs. Mills was talking and he said he wondered how it could have happened. She said she didn't know and he said 'maybe he has been shot,' and Mrs. Mills said, no, she didn't think anybody would be mean enough to shoot him and Mr. Long said, 'No, I don't either.' He said, 'You know I wouldn't be mean enough to shoot him,' but he says, 'We have all got to die and it might as well have been him as me or anybody else.' And then just before we got to his house somewhere along the road—I don't remember just where, why he made the statement, he says, 'I expect they will find him shot and cut all to hell.''

While appellant was at the sheriff's office the sheriff received a telephone call informing him that a pair of overalls with a blood stain on the knee had been found under an old boiler in a chicken yard near appellant's home. The sheriff informed appellant of this fact and appellant is alleged to have replied: ''They are mine and that is sheep blood. We were docking sheep,'' or words to that effect. Another witness testified as follows with reference to a statement made by appellant after the homicide and while appellant was out on bail:

''Q. What was said in that conversation last summer with reference to the death of Fay Oliver? A. Well, one thing he said, he just says to me, we was talking about different things and he said 'If you had a brother that you knew had killed a man you wouldn't be running around all over the country telling it like Jack Long is.' ''

Evidence was introduced, over the strenuous objection of appellant, to statements he is alleged to have made at Kirksville, Missouri, while out on bond and while engaged in a fight. A witness named Armada Wood, who had never known appellant and did not know him at the trial, was permitted to testify as to statements she heard made. The only way in which the witness claimed to know appellant made the statements was that a Mrs. Vansickle had told her it was appellant. Mrs. Vansickle was in the courtroom attending the trial but did not testify. The statement attributed to appellant was related by the witness as follows:

"A. Well, on this night I just returned home from the show. I was sitting on the front porch and heard a noise of these men starting running down the street and this one said, 'I will kill you! I will kill you!' He said that several times and I heard someone knocking the other one down and then he wanted ten dollars. Of course, I couldn't hear exactly what they were saying, and then he threatened to hit him over the head—there was part of the conversation I missed—I heard this other one say, 'I am going to the pen for life anyway,' this other one says—Long says, 'Give me four dollars and I will let you up.' That is what this man said."

Another witness testified as to what was said between appellant and the man with whom he was fighting at Kirksville. This witness states the substance of the conversation as follows:

"Q. What did you hear while they were fighting and cursing? A. Well, I heard Adam tell him to give him that money and he refused to do it.

"Q. Who do you mean? A. Mr. Long. There was only the two of them there.

"Q. Yes. A. And Mr. Long, of course, didn't give him the money.

"Q. What did Mr. Long say, if anything? A. And he said, 'Give me that money or I will kill you.' Of course, Long didn't give him any money and he said, 'Give me ten dollars. If you don't I will kill you.' He said, 'You are going to the penitentiary for life anyway, and give me that money.' . . .

"Q. Go ahead. What did Mr. Long say? A. He said, 'I wouldn't if you would keep your mouth shut.'

"Q. Said what? A. 'I wouldn't if you would keep your mouth shut.'

"Q. Did Hoermann say anything else in that conversation that you remember of? A. Oh, there was a lot said, cussing each other and Adam kept demanding the money from him."

On the night of the homicide the sheriff went to the home of appellant about eleven o'clock or later. After being admitted by the wife of appellant the sheriff found appellant sitting on a bed clothed in his underclothes. He ordered appellant to dress for the pur-

pose of being taken to jail. The sheriff testified that appellant's clothing, including overalls, was lying upon the floor near the bed. When they arrived at the sheriff's offices the following occurred, according to the evidence of the sheriff:

"A. When I got to my office, I started Mr. Byrnes out to hunt for Mr. Brown and also my other deputy, Mr. Morrow. Mr. Long and I was at my office by ourselves at that time and Mr. Long asked me— he said, 'If I did do that, what would the penalty be?' I said, 'Well, George, it might be fourteen years; it might be life, or they might hang you.' He said, 'Well, I didn't do it but I wanted to know what the penalty would be.' He says, 'You know, Ralph, I didn't do it.' "

Evidence was also introduced that while in jail awaiting trial a hacksaw was delivered to appellant at his request. It was also shown that a bar of a door had been sawed in two and a tobacco sack hung over it so as to hide the cut part from view.

A witness named Ray Anscomb lived five-eighths of a mile from the scene of the crime. He stated that on the evening of May 12, about six-fifteen, while hoeing potatoes in his garden, he heard three shots fired; he also heard some screaming and between the first and second shot heard a voice cry out: "Don't shoot, George." The land lying between where the witness was located and the scene of the crime was rolling with a scattering of timber. On cross-examination this witness disclosed considerable hostility toward the defendant. He refused to make an estimate of distances between points well known to him. His answer would generally be, "I never measured it. I would have to measure it." The witness, however, knew the exact distance from his home to the scene of the crime though he admitted he had never measured it. As an illustration of his hostility note the following question and answer on cross-examination:

"Q. Now Mr. Anscomb how old are you? A. Well, I don't know that that is any of your business."

The witness was also impeached to a certain extent by evidence of previous statements made, which were inconsistent with his testimony. On cross-examination the witness admitted that he never said anything about hearing the shots or the screaming on the night of the homicide either before or after he had heard of the tragedy. The cross-examination concluded as follows:

"Q. Did your son eat supper with you that evening? A. Yes, sir.

"Q. Did you tell him that evening about what you claim now that you heard? A. Didn't say nothing about it. Didn't think nothing about it.

"Q. You didn't think enough of it to say anything about it? A. Just thought somebody was hunting up there.

"Q. All that you heard, you say, created the thought in your mind that it was somebody hunting? A. Yes, sir."

A bacteriologist made a test of the blood on the overalls. This test, in the opinion of the witness, showed that there was human blood upon the overalls.

The State obtained a search warrant on the pretense of making a search for intoxicating liquor, but in reality the search made was to find evidence against appellant on the charge of murder. Appellant's home, out-buildings and premises were thoroughly searched. The extent of the search went so far that all of the water was pumped from the wells. Nothing was found in this search, in which many persons took part except the .38-caliber cartridges. The overalls were not found by officers searching under the warrant, but by an outsider who was also searching for evidence.

Appellant introduced evidence that on the 12th day of May he did not wear the overalls found in the chicken yard. Appellant, when testifying in his own behalf, denied ownership of these overalls and denied having made a number of the statements attributed to him. He stated that he wore the same clothes the night he was arrested that he had worn during the day. He emphatically denied the killing. Appellant's wife testified that appellant was in and about the home after five-thirty P. M. and that they had their supper together about six P. M. Two witnesses testified that on the afternoon of May 12, they were working in a field adjoining the one where deceased was ploughing. They did not remember at what time they last saw him. About six P. M. these witnesses quit work, loaded a wagon with wood and left the field about six-twenty. They testified that they did not hear any shots fired, nor hear any screaming, as testified to by witness Anscomb. It was definitely established by the evidence that the crime was committed between the hour of five-thirty and six-thirty P. M., May 12, 1932.

A rule often approved in cases of circumstantial evidence will be found in 16 Corpus Juris, page 763, as follows:

"In order to sustain a conviction on circumstantial evidence, all the circumstances proved must be consistent with each other, consistent with the hypothesis that accused is guilty, and at the same time inconsistent with the hypothesis that he is innocent, and with every other rational hypothesis except that of guilt." [See, also, State v. Pritchett, 39 S. W. (2d) 794, 327 Mo. 1143; State v. Freyer, 48 S. W. (2d) 894, 330 Mo. 62; State v. Dilley, 336 Mo. 75, 76 S. W. (2d) 1085.]

We are of the opinion that if measured by the above rule and authorities cited the evidence in this case falls short. There was no evidence whatever of any motive. If appellant in his heart desired to murder his neighbor it is highly improbable that he would perform this deed in broad daylight, upon a public road while men were working in nearby fields. The value of the evidence of the working of the

dogs, as a rule questionable and speculative, was of little probative value in this case. The powder burn upon the face of deceased, the stab wound inflicted after death and the probability that deceased was ambushed established, almost to a certainty, that deceased was assaulted and murdered in the roadway where the body was found. The culprit, therefore, must have been in the roadway near the body. The dog in making his trail commenced in the brush near the fence where it was thought the perpetrator of this deed had been in hiding. It will be noticed that from there the trail was made and at no time did the dog trail toward the place where the body was found. If the dog was actually on the trail of the guilty party then the murderer, after he performed his criminal act, returned to the hiding place and from there went the route followed by the dog. That he should thus retrace his steps to his hiding place and from thence flee is highly improbable. Considering also the fact that numerous people gathered at the scene from all directions destroys to a great extent the value of the evidence of the trail made by the dog. [State v. Shawley, 334 Mo. 352, 67 S. W. (2d) 74, l. c. 86 (26, 27); State v. Rasco, 239 Mo. 535, 144 S. W. 449, l. c. 459.] Conceding that the dog followed a trail the question remains, whose trail was it? That the dog was placed on the trail of the guilty party is highly speculative. That it followed appellant is also highly speculative. Note that in the Rasco case the dogs were permitted to follow the trail not only to the defendant's home but into the home and to a pair of shoes in the room of defendant. Note also that tracks along the road were measured and proved to fit the shoes of the defendant. We have no such corroborative evidence in this case. A dog after all only follows a trail by scent. He cannot distinguish between a guilty and an innocent man. It will also be noted that the place, where it was thought someone had been hiding, was not discovered until long after the crowd had gathered. It was not guarded until after twelve o'clock that night. Shoe tracks were found at this place but no attempt was made to measure them or compare them with appellant's shoes.

The blood on the overalls, when connected with appellant's statement that the overalls belonged to him and that it was sheep blood, was a circumstance against him, assuming that the chemical analysis was correct. However, the first time appellant saw the overalls he denied that they were his or that he had ever worn them. He introduced evidence that he had not worn those overalls on the day of the homicide. The testimony of the sheriff corroborates appellant in this, because when appellant was arrested the night of May 12, there was no blood found on any of his clothing. Had appellant worn the bloody overalls and committed the murder, in all probability, other clothing would have been blood stained. The overalls found near the bed were kept by the sheriff but were not produced at the

trial. The overalls found in the chicken yard and the .38-caliber cartridges were the only articles found upon appellant's premises after a most thorough search, which the State claimed incriminated appellant. The .38-caliber bullet removed from the deceased's head was a steel jacket one. The record does not disclose what kind were found in appellant's home.

Some of the statements attributed to appellant, if correctly understood and related by the witnesses, may be interpreted as incriminating. However, in connection with all of these statements appellant always denied having committed the crime. The evidence of an attempt to break jail was competent against appellant. However, appellant was out on bond, as evidenced by the episode at Kirksville. No attempt of escape during this time was shown by the record.

The evidence, when taken together and analyzed, in our opinion, only raises a suspicion against appellant. It certainly does no more than create a mere probability of guilt. This of course is not sufficient. [State v. Freyer and State v. Pritchett, supra; 16 C. J. 766, sec. 1570, and cases there cited.] The circumstances in the Pritchett case, supra, were much stronger against the defendant than the evidence against appellant in this case. This court remanded that case in order to give the State the opportunity, in the event more evidence was found, to again try the defendant. The verdict of the jurors in this case cannot be explained, except that in all probability there was some doubt in their minds as to the guilt of appellant. The circumstances surrounding the crime were so revolting and so cruel that life imprisonment would be the minimum to be expected from a jury who were convinced beyond a reasonable doubt of the guilt of the defendant. The fatal shots were fired into the back of deceased. He was shot and stabbed after death, showing the culprit bore malice and vengeance against the deceased.

We have treated at length the question of the sufficiency of the evidence to sustain a conviction and have concluded it was insufficient. The case will be reversed and remanded to give the State an opportunity to again try appellant in case sufficient evidence be found.

■ Anticipating the possibility of such a trial it will be necessary, for the guidance of the trial court, to pass upon a number of other questions presented. Appellant objected to the evidence of Armada Wood, the substance of which has been stated above. This evidence was purely hearsay and should not have been admitted. The witness's only knowledge of the facts was that she heard certain statements. She did not know who made them at the time and could not, at the trial, state that it was appellant. This information the witness obtained from a third party, who claimed to know appellant but who did not testify. We ruled on a similar situation in State v. Cain, 37 S. W. (2d) 416, 1. c. 418 (6, 7) and held that the admission of such

evidence was reversible error. [See, also, State v. Patton, 255 Mo. 245, l. c. 261, 164 S. W. 223, l. c. 227 (7).]

The evidence pertaining to the work of the dogs was objected to on the ground that the proper showing was not made as to the pedigree of the dog or its training. Appellant in his brief states, and the record supports the statement, that the dog used in this case was the same dog used in the case of State v. Freyer, supra. We held the evidence offered in that case admissible. It is true the case was reversed because the evidence was not sufficient to sustain a conviction, but that does not mean that the evidence was incompetent. On the authority of that case we rule the point against appellant. Appellant should have been permitted to show, as he attempted to do, that Freyer was discharged. The hound's master, Fenton, testified that the dog had successfully made a trail in the Freyer case and that Freyer had been convicted. The jury was led to believe the conviction was obtained principally on the evidence pertaining to the work of the dogs. This court has never sustained, and let us hope never will sustain, a conviction solely on what may be termed bloodhound evidence.

A motion to suppress the evidence obtained by the search was made by appellant. The overruling of this motion was assigned as error. The only articles found in the search were the number .38-caliber cartridges. Appellant's counsel in cross-examining a witness first brought out the fact that the cartridges had been found. He, therefore, was in no position to complain of this evidence when offered by the State. Appellant was arrested at his home. It was not contended that the officer did not have reasonable ground to place appellant under arrest. Therefore, the officer making the arrest had the right to search appellant and the place of arrest. [State v. Williams, 14 S. W. (2d) 434, 328 Mo. 627.]

Error was assigned to the action of the trial court in overruling appellant's objection to the introduction and exhibition to the jury of bloody clothing worn by deceased at the time of the homicide. At the first indication of any intention on part of the State to introduce these articles appellant's attorneys made the following objections:

"Q. Did you see any blood around close there? A. There was some on the ground, where I turned him over where he had been lying.

"Q. Was there any on his clothing at any place? A. Yes, sir.

"MR. DORIAN. We object to the exhibit of the stab, clothes and blood. We are not resisting the fact that this man was stabbed and shot just as they say he was. They have no right to make an exhibit in the presence of this jury.

"Mr. Rendlen. The defense do not deny but admit that Fay Oliver met his death on the 12th of May, 1932, in Knox county, Missouri, and that he was shot; also that he had a stab wound on his body. Of course, we deny that the defendant did it.

"The Court. In a criminal case it is impossible to stipulate matters. The jury is supposed to be common sense men—they are not going to be carried away.

"Mr. Rendlen. We object, for the reason it is unlawful, improper and invades the rights of this defendant, and is prejudicial, to exhibit what is now being taken out of the receptacle of some clothing and to attempt to exhibit it to the jury—we object to it as improper.

"The Court. Overruled."

The authorities upon this subject were thoroughly reviewed by this court in State v. Shawley, 334 Mo. 352, 67 S. W. (2d) 74, l. c. 82, 85 inclusive (12-17). The conclusion there reached in substance was that if such evidence would tend to establish any fact at issue or would tend to throw light on the controversy and aid the jury in any way in arriving at a correct verdict the evidence should be admitted, be it ever so gruesome. It will be noted by the text and cases there quoted and cited that the conclusion reached is supported by the greater weight of authority. It may be said that cases wherein such evidence is inadmissible are exceptions to the rule. The circumstances surrounding this case and the open, frank admission of counsel for appellant contained in the objections, in our opinion, place this case within the exception. The bloody clothing worn by the deceased could not in any manner have aided the jury in arriving at a verdict. They would not tend to connect the accused with the crime, prove the identity of the deceased, or show the nature of the wound. [State v. Porter, 276 Mo. 387, 207 S. W. 774, l. c. 777 (4, 5).] The admission of counsel for appellant meant that appellant was not disputing the fact that deceased was murdered nor the nature of the wounds inflicted. The medical evidence, offered by the State, fully established the nature of the wounds in every particular. The exhibition of the bloody clothing added nothing to the facts thus established. If, therefore, on a retrial the same objection be made, including the admissions, the evidence should be rejected. [State v. Porter, supra; State v. Creed, 299 Mo. 307, 252 S. W. 678, l. c. 681 (3); State v. Rennison, 306 Mo. 473, 267 S. W. 850, l. c. 853 (8).]

Error was assigned with reference to the admission of the evidence pertaining to the blood test made of the blood alleged to have been found on the overalls. On a retrial the State should be required to account for the whereabouts of the overalls from the time they were found until they reached the hands of the bacteriologist and to prove that they were in the same condition as when found.

■ Instruction No. 7 was made the subject of an assignment of error. It reads:

"The court instructs the jury that if you find and believe from the evidence that the defendant made any statement or statements before or after the death of the said Fay Oliver, as testified to by any witness or witnesses, if you find and believe that such witness or witnesses have testified to any statements made by defendant, and if you further find and believe from the evidence that the defendant has not denied any such statements, if any, in the trial of the case, then the court instructs you that you are warranted in finding that the defendant admits that he made such statement or statements, if any."

In our opinion this instruction contains the same vice as the instruction condemned by the court en banc in State v. Johnson, 333 Mo. 1008, 63 S. W. (2d) 1000, l. c. 1003 (on motion for rehearing). This instruction in effect told the jury that appellant's failure to deny having made statements attributed to him amounted to an admission on his part of having made the statements and the jury should so find. This instruction clearly invades the province of the jury. Jurors should be at liberty to determine for themselves the question of whether a witness truely related statements alleged to have been made by a defendant. A jury may not believe a witness because of his demeanor on the stand, or feeling against a defendant even though such witness's testimony was not contradicted. In the Johnson case, on motion for rehearing, the following excerpt from State v. Thomas, 250 Mo. 189, 157 S. W. 330, l. c. 339, was approved:

"In the opinion of the writer there is grave doubt as to the propriety or necessity of trial courts giving any instruction attempting to define the weight to be given to oral admissions or confessions against interest. Such instructions violate the plain letter and spirit of section 5244, Revised Statutes 1909 (now Sec. 3694, Mo. St. Ann., p. 3249), prohibiting courts from commenting upon evidence." [State v. Duncan, 336 Mo. 600, 80 S. W. (2d) 147. See, also, State v. Hudspeth, 150 Mo. 12, 51 S. W. 483, l. c. 487.]

In that case an instruction, almost an identical form as Instruction No. 7 now under consideration, was condemned.

■ During the closing argument to the jury, by a State's attorney, a statement was made disparaging the character and integrity of appellant's attorneys. The trial court very promptly sustained an objection to this argument and informed the jury that it was improper and should be disregarded. Attorneys for appellant earnestly insist that the State's attorney should have been reprimanded after they requested the trial court to do so. Statements of this character, made by attorneys, have often been disapproved by this court. When such arguments are made in spite of these rulings a trial court may, within its discretion, administer a reprimand.

Trial courts naturally are reluctant to do this, but attorneys should stay within the rules and refrain from making abusive remarks about opposing counsel. The question of reprimanding attorneys for misconduct, during the progress of a trial rests largely within the discretion of the trial court.

In view of the fact that the case must be reversed and remanded we deem it unnecessary to discuss the remaining assignments of error. As above indicated, the judgment of the circuit court is reversed and the cause remanded to give the State an opportunity to retry appellant if additional evidence can be found sufficient to make a case for a jury. *Cooley* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.