THE STATE v. TONY NICOLETTI, Appellant.—125 S. W. (2d) 33.

Division Two, February 21, 1939.

*Philip A. Foley* for appellant.

*Roy McKittrick*, Attorney General, and *W. J. Burke*, Assistant Attorney General, for respondent.

COOLEY, C.—By indictment returned in the Circuit Court of St. Louis County, Frank Fiorino and the appellant herein, whom we shall call defendant, were charged jointly with the crime of grand larceny, alleged to have been committed in said county on August 17, 1934. It seems Fiorino absconded. Defendant Nicoletti was granted a severance, and after several continuances he was tried alone, was convicted and sentenced to two years' imprisonment in the penitentiary and has appealed. The principal question presented by the appeal is as to the sufficiency of the evidence. The evidence on behalf of the State tended to show the following:

On August 17, 1934, some person or persons entered the residence of Lewis S. Haslam, in Webster Groves, St. Louis County, and stole therefrom a pair of pearl or pearl inlaid opera glasses, an open faced yellow gold Elgin watch with a watch fob attached and, attached to the fob, a Phi Beta Kappa Key, also a "diamond engagement ring, white gold" and a "diamond cluster ring, white gold." Neither Mr. Haslam nor his wife was at home at the time. Mr. Haslam died in September, 1935, before this case was tried. Mrs. Haslam testified at the trial. She said that at the time of the larceny she was employed at St. Luke's Hospital; that on the morning of said August 17th when she left home to go to the hospital her husband was not at home; that she left the two diamond rings on her dresser; that when she returned home she found the room and dresser and bureau drawers in disarray, as though someone had rummaged through them, with much

of the contents of the drawers dumped on the floor; and that the above described articles were missing. Soon thereafter she and her husband found the watch, fob and key at the pawnshop of one Miller and the opera glasses at another such place kept by one Schmidt. They identified and recovered those articles. It does not appear that the rings were recovered or found. At the trial the articles so recovered were clearly identified. It was shown that on said August 17th defendant pawned the watch, fob and key to Miller, and on August 18th pawned or sold the opera glasses to Schmidt, in each instance giving his name as Louis Longo and, to Miller, giving his address as 3100 Easton Avenue, St. Louis. Both name and address so given were false.

Mrs. Haslam testified that the watch was worth $20, the Phi Beta Kappa Key $7 and the opera glasses $10. She said the watch fob was of nice leather and "worth something" but did not name a value. Mr. Schmidt, asked the reasonable market value of opera glasses such as those in question, said, "They run new about twenty-five dollars." Mrs. Haslam testified that the watch, fob and key belonged to her husband, and the opera glasses to him and her both; that the diamond engagement ring was hers, having been given to her by her husband. She did not say which of them owned the other diamond ring. She gave the value of the engagement ring as $150 and of the other ring $300.

Defendant was arrested August 27, 1934, at Schmidt's place, where he was trying to dispose of another watch and some jewelry, description not disclosed and not here material. At police headquarters at Webster Groves he made and signed a written statement, as follows:

"August 30th, 1934.

"I, Tony Nicoletti, 24 years old, a native of Italy, single and residing with my Mother at 2805 Belt Avenue, St. Louis, Mo., do make the following statement of my own free will, without threats or promise of immunity on the part of the Webster Groves Police Department or on the part of Andrew McDonnell, Chief of Police:
That:

"On Friday, August 17th, about 11:00 o'clock A. M. I left my mother's store at 2945 Cass Avenue, St. Louis, accompanied by Frank Fiorino, Alias Tirorno, Frank having ask me to drive him in my car to Woodson Road in St. Louis County. We drove around and at a place which I later learned was in Webster Groves, Frank told me to stop and wait for him, when he came back he told me to drive back to my mother's store, when we got back to the store he gave me a watch and a pair of Opera glasses and told me to pawn them. I pawned the Opera glasses at a pawnshop at 908 Franklin Avenue for $1.50 and the watch at a pawnshop at 113 No. Broadway for $1.25.

"On Friday, August 27th, Frank gave me another watch and some jewelry and told me to take them and pawn them, I took them to the

pawnshop at 908 Franklin Avenue where I was arrested by St. Louis Police Officers with the above watch and jewelry on my person.
"(Signed) Tony Nicoletti."

Defendant, testifying for himself, admitted having made the above statement voluntarily and said it was true. He testified that he lived at 2805 Belt Avenue (City of St. Louis); that on August 17th, 1934, in the forenoon, Frank Fiorino came to his (defendant's) mother's store and asked defendant to drive him "out in St. Louis County," as he had "some business to take care of;" that he did take Fiorino in his (defendant's) car to a place in Webster Groves, Fiorino directing the way; that he did not know the street but stopped where Fiorino told him to and remained in the car (but not as a lookout) while Fiorino went in, saying he "would be right back;" that he could not tell how long Fiorino was gone, and when he returned to the car they drove back to his mother's store; that Fiorino gave him the opera glasses and the watch, fob and key and told him to pawn them, which he did and gave Fiorino the money; that he did not then know the articles had been stolen—did not learn that until he was "locked up." He admitted giving the name Longo at the pawnshops. At one— Miller's, the one where he had pawned the watch, fob and key on August 17th—he had signed a card or record kept by Miller, signing the name Longo. Asked why he had used that name he said, "Well, I didn't even know his last name. I couldn't even think of it at that time." (He had given his name as *Louis* Longo. Fiorino's Christian name is Frank). These questions and answers followed:

"Q. Did you know Longo? A. I knew Longo. They locked me up, and I remembered at that time I made a mistake, that his name was Fiorino.

"Q. Did you go back there the second time? A. Yes, and the second time I went down there I knew it was Frank Fiorino.

"Q. How did you know him? A. I knowed him from coming in the store."

[By "second time" he may have meant the second visit to Schmidt's, which was on August 27th.]

On cross-examination he said that he used the name Longo because he thought at that time "the other boy's" name was Longo—that "the time he came over the second time I heard his name." He was asked why he did not take the opera glasses to Miller's where he pawned the watch, and replied, "The glasses was the first time . . . I didn't get the watch at that time." [But the State's evidence shows that the watch, fob and key were pawned to Miller on August 17th and the opera glasses to Schmidt on the 18th.]. Defendant gave no explanation of why he had given his address to Miller as 3100 Easton. The police could find no one at that address by the name or answering the description of "Longo." Defendant offered no evidence other than his own testimony.

Appellant argues that the evidence does not show when the watch and fob, with key attached, were taken; that Mrs. Haslam said they were gone, but did not say when they were last in the possession of Mr. Haslam; that from the description of the watch, an "old fashioned" one, it might be presumed it was not carried by Mr. Haslam and that it may have been kept "more or less as a keepsake, tucked away in some obscure drawer," and seldom looked at, and might have been gone for a long time. The argument is ingenious but not persuasive. When Mrs. Haslam returned from work on the evening of August 17th she found that since her departure in the morning the house had been ransacked, dresser and bureau drawers rummaged through and the watch with its attachments was missing. She, no doubt, knew where it had been kept. Other articles, including the opera glasses, known to have been there in the morning, were missing. That day defendant had driven his companion, Fiorino, to the vicinity of the house and on their return from that trip Fiorino, according to defendant's statement to the police, had given him the watch and opera glasses to pawn. There was no evidence or intimation that Haslam's house had been robbed at any other time.

 It is further argued that defendant explained his possession of the articles he pawned in a way consistent with his innocence and that therefore no inference of guilt could properly be drawn from such possession, and since there was no direct evidence of his guilt no case was made. In State v. Dilley, 336 Mo. 75, 80, 76 S. W. (2d) 1085, 1087 (2), this court said:

"It is established law that the recent exclusive possession of stolen property will support an inference that the possessor was the thief; and the decisions say such possession need not be exclusively in the defendant but may be in him and another person jointly. Convictions have been sustained where the evidence showed both were in possession or that both asserted dominion over property in the possession of one of them, as by attempting to sell it." (Citing cases.)

Defendant gave an explanation of his possession, but it was for the jury to determine whether or not he was telling the truth or how much of the truth he was telling. He drove Fiorino to the scene of the crime and, he says, waited in the car while (if that part of his story is true) Fiorino did the actual stealing. Of course he said he did not know what Fiorino was doing while he waited and that he did not know until after he had pawned the stolen articles that they were stolen. The jury evidently did not believe that. On their return from that trip Fiorino gave him those articles to pawn or sell, and without asking or receiving any explanation from Fiorino for such request he undertook that mission. He gave a false name and address to the persons to whom he disposed of the stolen property. We need not further refer to the facts, which have been outlined in our statement. The jury may well have believed that defendant

himself was the thief or was *particeps criminis* with Fiorino. The demurrer to the evidence was properly overruled.

Appellant contends that there was a fatal variance between pleading and proof in this:—The indictment alleged that all of the property therein alleged to have been stolen was the "property of L. S. Haslam." As shown in our statement Mrs. Haslam testified the watch and its attachments belonged to Mr. Haslam and were worth $27; the opera glasses belonged to both Mr. and Mrs. Haslam and were worth at least $10. There was thus direct evidence that enough of the stolen property to aggregate more than $30 in value—making the stealing grand larceny—was owned by Mr. Haslam or by him and his wife. By Section 3554, Revised Statutes 1929 (Mo. Stat. Ann., p. 3153), when an offense is committed in relation to property belonging to several partners or owners the indictment may properly allege the ownership to be in one or more of such partners or owners, without naming all of them. Under this statute the ownership of the opera glasses, if owned by both husband and wife, was sufficiently charged as being in the husband. See State v. Teague (Mo.), 33 S. W. (2d) 907, where stolen chickens were alleged to have belonged to the husband and the proof was they belonged to the husband and wife. We held there was no fatal variance, citing the above section, also State v. Lamb, 141 Mo. 298, 42 S. W. 827, q. v.

By the principal instruction herein the court submitted to the jury that if they found, etc., that defendant and Fiorino stole the opera glasses, the watch, fob and key and the rings (appropriately describing those things) "or any of the same and that the same was . . . the property of L. S. Haslam . . . and that the property so taken . . . was of the value of thirty dollars or more," etc, they should find defendant guilty. As we have shown, there was property stolen such that enough "of the same" was properly charged to be the property of L. S. Haslam that the stealing thereof would be grand larceny, viz., the watch, fob and key and the opera glasses. The jury could legitimately have found defendant guilty of grand larceny without considering the rings. But, appellant says, they may have considered the rings also, and, he says, they were not shown to belong to L. S. Haslam. It is true Mrs. Haslam said the engagement ring was hers, having been given to her by her husband. There was no testimony as to who owned the other diamond ring. But husband and wife were living together. In the legal sense he was head of the family and the residence in which they lived was his residence. [State v. Nelson, 101 Mo. 477, 14 S. W. 718.] The actual ownership of the diamond cluster ring was not shown, but both it and the engagement ring were in the residence of L. S. Haslam and were stolen therefrom. In a larceny indictment the ownership of the stolen property may be charged either in one who was rightfully in possession as special owner, as, for example, consignee, carrier, or the like, State v. Lackey, 230

Mo. 707, 132 S. W. 602, or in the general owner. We need not determine whether or not L. S. Haslam, being the owner of the residence from which the rings were stolen, had such possession thereof as to authorize charging in the indictment that he was the owner, because the variance, if such it was, between pleading and proof in this case was non-prejudicial.

Section 3562, Revised Statutes 1929 (Mo. Stat. Ann., p. 3158), provides that whenever on the trial of any felony or misdemeanor, there shall appear to be any variance between the statement in the indictment or information and the evidence offered in proof thereof, in (among other things) the name or description of any matter or thing therein named or described "or in the ownership of any property named or described therein" such variance shall not be deemed grounds for acquittal unless the trial court shall find that such variance "is material to the merits of the case and prejudicial to the defense of the defendant." The trial court made no such finding in this case.

The above statute was applied in State v. Nelson, supra. There the defendant was charged with burglary and larceny. The indictment charged that he had broken and entered the dwelling house of Elizabeth F. Van Duzer and stolen therefrom certain jewelry, the property of said Elizabeth F. Van Duzer. The proof showed that said Elizabeth was a married woman living with her husband and family in a house rented by him and that the jewelry belonged to Elizabeth's daughter, Gertrude, then past eighteen years of age, who occupied a room in the house, the jewelry having been stolen from Gertrude's room. This court said the indictment should have charged the ownership of the house in Elizabeth's husband and that there was therefore a variance between indictment and proof, both as to ownership of the dwelling house and as to ownership of the property stolen therefrom, but held that the variance was cured by the statute and the failure of the trial court "to make the required finding." We may appropriately quote here, from the Nelson case, 101 Mo. l. c. 482, 148 S. W. l. c. 719: "When we look at the circumstances disclosed by the evidence, it is very clear that the variance could not and did not, in the least prejudice the defendant's defense. The merits of the case in no wise depended upon the question whether the husband or the wife was the owner of the house burglarized; nor upon the question whether the mother or daughter was the owner of the jewelry." In the case before us the merits of the case in no wise depended upon the question whether the husband or the wife owned the rings, and the variance complained of could not and did not prejudice the defendant's defense. The Nelson case was cited and followed in State v. Lackey, supra, a burglary and larceny case in which, as to the larceny, there was a variance between indictment and proof as to the ownership of the stolen property and it was held not fatal, under the statute.

■ Appellant complains of Instruction No. 5, on credibility of witnesses because, he says, the evidence did not warrant that part thereof telling the jury (in substance) that if they believed any witness had willfully sworn falsely to any material fact they should disregard the false testimony and were at liberty, if in their judgment they thought proper, to disregard any or all of such witnesses' testimony. The form of the instruction is not challenged, but, as stated above, appellant argues that the evidence did not warrant giving the portion referred to. We think it did but shall not take space to discuss that or the other instructions because objections thereto are not sufficiently presented in the motion for new trial, wherein defendant said only: "The Court erred in giving, over the objection of the defendant, each and every instruction, for the reason that said each and every instruction did not properly instruct as to the law in the case." Such vague and general assignment in a motion for new trial has so often been held insufficient that citation of authorities is needless.

We have discussed the questions urged in appellant's brief. He appears from the record to have had a fair trial and the verdict is supported by substantial evidence. We find no prejudicial error in the record. The judgment is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.