THE STATE v. LESLIE FREYER, Appellant.—48 S. W. (2d) 894.

Division Two, April 8, 1932.

*E. C. Kennen, Kenneth G. Kennen* and *Emil Roehrig* for appellant.

64

*Stratton Shartel,* Attorney-General and *Don Purteet,* Assistant Attorney-General, for respondent.

ELLISON, J.—The appellant was indicted for arson in Audrain County. On a trial of the cause in Warren County, on change of venue, he was convicted by a jury and his punishment assessed at two years' imprisonment in the penitentiary. The property destroyed was a threshing separator standing on premises about a mile from his home. It was found burning about midnight. The chief, if not the only, evidence connecting the appellant with the fire was obtained through the use of bloodhounds. His principal contention on this appeal is that the proof was insufficient to support a conviction, and that the trial court erred in refusing to give his requested peremptory instructions in the nature of demurrers to the evidence.

The separator belonged to George W. Smith who was engaged in the business of threshing grain in the vicinity of Laddonia, Missouri. He had moved the machine and a steam threshing engine to the farm of Albert Freyer, a nephew of the appellant, about four o'clock in the afternoon of Saturday, July 27, 1929, preparatory to doing some threshing there the following Monday morning. Apparently it was his first job of the season. That day at his own home he had steamed up and run above thirty bushels of oats through the separator to see if everything was in working order; and then pulled over to Mr. Freyer's. The outfit was run into a lot about 250 or 300 feet east of the barn and left standing, coupled. Smith

dropped the damper of the engine, pumped in plenty of water, covered the separator with a tarpaulin, and departed for the day. The next morning, Sunday, about nine o'clock he returned, fixed a pile of kindling, cleaned the flues of the engine, and shook down the grates, raking the ashes to one side. He discovered no fire and the ground was practically bare so there was little chance of it's spreading even if there had been any. Albert Freyer, who lived on the farm, was around the engine close to five o'clock that afternoon and found everything in good shape.

About midnight that night Mr. Freyer was called on the party line telephone by a neighbor woman who informed him she could see something was on fire at his place. He went out and found the separator burning. The part on fire was the back half—farthest from the engine. He rushed back into the house, hurriedly dressed, and returned to the fire; but it had gained too much headway to be extinguished, so he did little except to remove the coal from a box carried between the engine and front end of the separator. Four or five neighbors came over and stayed about two hours, but at his request they did not go to the burning machine. Freyer, himself, refrained from walking along the east side thereof. The evidence shows he purposed, even at that early hour, to use bloodhounds and desired to preserve the scent for them, or else sought to avoid the obliteration of any tracks that might have been left by the perpetrator of the supposed arson.

Smith, the owner of the separator, was called about twenty minutes after the fire was discovered. He got up and started to the Freyer farm but on the way met a Mr. Thompson, who owned the land. (Freyer occupied the place as tenant.) They drove to Ladonia and telephoned the sheriff about bloodhounds. After a rather unsatisfactory talk, they went back to the Freyer home, remaining a few minutes, and then proceeded over to Mexico about three o'clock in the morning. There the sheriff, by telephone, engaged bloodhounds belonging to a man named Fenton who lived in Columbia.

A public road ran east and west along the south side of the Freyer land and at the southeast corner of the farm a "blind" lane or cul de sac led off south from the public road for a distance of about half a mile through the land of W. B. Kennedy. Mr. Kennedy's house and improvements were a little over a quarter of a mile south of the public road, and set back about 300 feet west on the lane. From the south end of the lane it was about a half-mile southeast across fields to the appellant's home. Mr. Kennedy testified that about midnight he heard his house dogs barking vigorously as if pressing closely toward and then returning from someone passing in the lane east of his house. A certain amount of thievery had been going on in the neighborhood, so he got up and looked out in

that direction. Very shortly thereafter the telephone rang and he learned the separator at the Freyer place was burning. He looked out, north, and could see the fire plainly. He dressed, filled and lit his lantern and walked up to Mr. Freyer's house. After spending about two hours there with other neighbors he returned to his own home. The inference is that going and coming he walked along the lane heretofore mentioned, with his lantern.

The next morning, Monday, about ten o'clock the bloodhounds arrived in charge of two men from Columbia, one a Mr. Fenton, son of the owner, and the other officer Gilliland, a Columbia motorcycle policeman. They were accompanied by Mr. Lackland a deputy sheriff of Audrain County. There were three of the dogs. Only two of them were used, as will be later explained. Both these were pure blood, pedigreed English bloodhounds, one a bitch eight years old named Fenton's Lady, and the other her pup, a dog named Dempsey, about two years four months old. The Fentons said they had been in the business six years; that they had seen the female dog follow human scents fifty or seventy-five times and the younger dog ten or fifteen times. Both dogs had been trained, and actually used in tracking three offenders who later were convicted. In practice tests the older dog was accurate nearly 100 per cent. The younger did "very nicely," they said, and usually worked with his mother. Fenton's Lady had a record of following a trail thirty-six hours old; but the scent is stronger on moist ground than dry, and on the occasion involved in this case the ground was dry.

The dogs were on leash. In the beginning all three were used. Young Mr. Fenton had two of them and officer Gilliland the third. The evidence inferentially is that no particular object supposed to have been left by the arsonist was found at the ruins and presented to the dogs to be smelled. They were simply started from the east side of the ruins of the separator, where no one else had been after the fire. They made a circle to the northeast and then looped to the south, both times returning to the separator. One of the dogs was frightened at the strange surroundings and "kept getting mixed up," so they put him back in the automobile. The other two, heretofore named, then started southeast to the corner of the lot and went through a gap in the fence; on the outside of the fence footprints were discernible pointing south or southeast across the public road and in the direction followed by the lane.

The dogs crossed the road and continued south down the lane a quarter of a mile, stopping at a point where there were a good many footprints over at one side. Then they turned west, pulling their masters after them, and went the 300 foot distance up to Mr. Kennedy's house and outbuildings. Mrs. Kennedy gave them some water. They came back, retracing their course for the 300 foot

distance to the lane, and turned south to the end of the lane where there was a gate and a panel of board fence. One of the dogs reared up and by this means the men discovered what seemed to be the print of a hand, which smelled of kerosene, on one of the boards four or five feet above the ground. This was called to the attention of several persons. The dogs rested there for a while and then continued southeast across the fields and through, over or under fences in a rather erratic course until they came in sight of the appellant's home. It seems the deputy sheriff and the neighbor Kennedy followed along with the dogs and their masters for a considerable distance, but only the latter went upon the appellant's land or testified about what occurred there. Mr. Kennedy and the sheriff stopped at the property line.

The bloodhound men say they observed the appellant near one of the outbuildings either walking in their direction or facing them, some distance away. Apparently he saw them, turned around, climbed a fence, and hurried or ran in the opposite direction for a short distance until hid from view by a building. The dogs continued up to the barn where they began to whine. They went around the edge of the barn and through a yard gate to the back door of the house where the older dog whined and scratched the screen and wanted to get in. A woman came to the door and asked the men what they wanted but they didn't answer her. The dogs went from the door to an outbuilding, thence back to the door, and around to the front porch where they lay down. Mr. Kennedy testified he went far enough with the dogs to see clear up to the appellant's barn, but he did not say he saw the appellant retreating or running—or see him at all.

The men pulled the dogs off the porch and put them under a tree nearby. About that time the appellant came out the back door and around to the front of the house. He had a bucket in one hand and his sleeves were rolled up. He said: "Them——of—— is framing on me." When he came within about fifteen feet of the hounds the older dog got up and lunged or started toward him. He said: "Hold that damned dog" and then: "Get them—— —— dogs off of this place." The two men led the dogs out into the road, and the appellant "went back to get the deputy sheriff." Up to the time the appellant uttered the above statement and commands to them, they had said absolutely nothing to him.

The footprints observed, in following the dogs down the lane were all similar and appeared to have been made by a shoe with a rubber heel. The scouting party failed to measure any of them, or the handprint on the fence, but houndmaster Fenton testified he observed the appellant's feet while at the house and they appeared to be the same size as the footprints. His shoes looked like they

had rubber heels. Officer Gilliland carefully noted the footprints coming down the lane and described them at the trial, but strange to say, he made no special observation of the appellant's feet while at his house, and couldn't tell anything about them. The fee charged for the dogs' services in this case was $50 or $55, one-half of which was paid by Mr. Smith, the owner of the separator, and one-half by Mr. Thompson, who owned the Albert Freyer farm.

On the theory that it tended to show a motive for the crime the State proved the appellant was a competitor in the threshing business of Smith, who owned the separator; that in 1923, six years before the fire, he had asked Smith not to thresh in his neighborhood, to which Smith replied he would not if appellant could get the business; that there were about fifteen grain raisers in the vicinity, many of whom would not employ the appellant, in consequence of which Smith did the work. In 1927 appellant again asked Smith not to come into that territory and Smith gave him the same answer. On that occasion the appellant appeared to be angry. Smith did continue to thresh there and was just starting the 1929 season with the appellant's nephew's job when the fire occurred.

The State presented twelve witnesses who swore the appellant's general reputation in the community for truth, veracity and good morals was bad. Among these were Smith, the owner of the separator, and Albert Freyer, the appellant's nephew, on whose farm the separator was when it burned. Six of these witnesses confessed to an unfriendly feeling for the appellant growing out of past transactions.

The appellant's defense was an *alibi*. He was forty-one years old, lived on the farm where he was born, and at the time of the alleged arson was engaged in farming and feeding 100 head of hogs and forty-four head of cattle. He said he had done "some accommodating threshing in the last year or two." In his behalf it was shown that on the Sunday the arson occurred his wife's sister and her husband, Mr. Baker, had spent the day with his family until eight o'clock in the evening. In the afternoon, while out with his brother-in-law looking at some cattle he became ill with a headache and diarrhea. He was indisposed during the remainder of the day, ate no supper, and left the chores for the children to do. After the Bakers left a Mr. and Mrs. Rogers, neighbors, called and visited about an hour.

Shortly after nine o'clock that evening the family retired, but he was unable to sleep, and about ten o'clock and again about midnight he got up and went downstairs, accompanied by his wife, to get some medicine. The appellant and his wife occupied one room; their daughter Mona, a girl sixteen years old, a room across the hall with the door open. They did not get to sleep until about two

o'clock. About ten o'clock that night an automobile went along the road past the house; and about one o'clock in the morning an automobile was heard to start up over in that direction. It passed east along the same road. These facts were testified to, in whole or in part, by each of the three persons mentioned. The prosecuting attorney's cross-examination of the daughter was particularly exhaustive and covers twenty-seven pages of the typewritten record. Another daughter Grace, fourteen years old, told about the movements of the family until they retired, but she went to sleep soon after that.

As to what occurred the next morning, the wife and daughter said that while engaged in the preparation of the midday meal they observed the bloodhounds, under leash, coming across the farm toward their house, and at first thought someone was driving hogs. Their account of the course followed by the dogs does not tally with the testimony of the two men who accompanied the dogs. They say also, the dog called Lady lay down at the yard gate and had to be pulled up onto the sidewalk, and that both dogs lay down in the yard and at the kitchen door, the idea being that they were not pressing forward on a hot trail. Both mother and daughter declared when the dogs and their masters reached the kitchen screen door the men spoke first, and that they remained in the yard perhaps fifteen minutes conversing until Mrs. Freyer went to the barn and called her husband, the appellant. The appellant, his wife, the daughter Mona, the daughter Grace, and a young son Leslie, Jr., all swore the appellant was engaged in a little family threshing at the time, assisted by the children Grace and Leslie, Jr., the former being posted on the tractor engine; and that he was up in the barn loft, barefooted, pushing back the hay, and had been for half an hour about the time the dogs arrived. This contradicts the story of the dog men that the appellant was seen to hurry or run behind a building as they approached, and that he wore shoes, which, to one of these two witnesses, seemed about the size of the tracks they had discovered. Mrs. Freyer and the daughter Mona were also at variance with the dog men in their account of the conversation which occurred after the appellant came up. They say he approached within two feet of the bloodhounds and that the dogs paid no attention to him.

The appellant produced five witnesses who swore his general reputation in the community for truth, veracity and good morals was good; but these witnesses chiefly came from Laddonia and remoter points, rather than from the immediate vicinity. The record indicates there was some feeling against the appellant among his neighbors.

In rebuttal the State showed by Mr. and Mrs. Rogers, the neighbors who had visited at the appellant's house between eight and nine o'clock the night before, that they saw or heard nothing indicating he was sick; and on cross-examination of the appellant or his family it was proven that he did some threshing for a neighbor the afternoon of the day the bloodhounds were used; and that he owned several pairs of shoes and wore them while working on his threshing engine. Still another witness for the State, in rebuttal testified he was riding on a mowing machine in a field some distance west of the appellant's house and saw the dogs when they approached the kitchen door; that they did not lie down, but reared up against the screen.

■ I. The learned Attorney-General has confessed error on the ground that the State's evidence fell short of making a case for the jury and we think this view is correct. We are unwilling to send a man to the penitentiary on proof so incomplete and inconclusive.

As was held in State v. Jones, 106 Mo. 302, 312, 17 S. W. 366, 369, where the property destroyed was a house, "the *corpus delicti* in arson is not merely the burning of the house, but that it was burned by the wilful act of some person, criminally responsible for his acts, and not by natural or accidental causes." The case is cited with approval and substantially the same language used in State v. Cox, 264 Mo. 408, 412, 175 S. W. 50, 51. The Jones case further declares, citing State v. Dickson, 78 Mo. 438, 448, "where a presumption is intended to be raised as to the *corpus delicti*, it ought to be strong and cogent;" and that "while it may be established by circumstantial evidence, the courts, and particularly the trial courts, should see to it that such evidence is cogent and convincing, and excluding all other reasonable hypotheses." The Cox case, supra, likewise remarks, "one fire unexplained ordinarily raises no presumption of incendiary origin." In general on this subject see 5 C. J. sec. 51, p. 570; 2 R. C. L. sec. 17, p. 513; L. R. A. 1916 D, pp. 1295, 1299, note.

■ The evidence that the fire in the instant case was started intentionally is altogether circumstantial and in our opinion exceedingly weak. The separator was just starting its season's work. There is no proof as to its condition—whether it had been cleaned and oiled. It had been run for a while the Saturday afternoon it was moved to Albert Freyer's place, and just afterwards a tarpaulin was spread over it such as might tend to keep out the air and leave fires caused by hot bearings, sparks and the like to smoulder. The separator was operated and pulled by a steam threshing engine which burned coal, and the inference is allowable that there might

72

have been oily waste or rags about the machinery. On the other hand the record is absolutely devoid of testimony connecting any human agency with the burning: nothing was shown to have been left on the spot by the perpetrator, there was no indication any arrangements had been made for an arson, no coal oil or smell of coal oil was discovered, and no footprints were found about the machine although the lot was practically bare and the ground was hard and dusty. There is good reason for saying the proof of the *corpus delicti* failed to measure up to the standards set by law.

■ II. Furthermore, even if we be in error in the conclusion just stated we are of the opinion the evidence was insufficient to fasten the crime upon the appellant. The State is dependent on the bloodhound testimony to do so. It is held that such testimony is competent for whatever it is worth, upon a sufficient preliminary showing of the breeding, capacity, training and experience of the hounds—assuming, of course, the evidence when introduced shows the dogs were put on a trail and followed it out. [16 C. J. sec. 1095, p. 564; 8 R. C. L. sec. 177, p. 184; Ann. Cas. 1912 D, p. 39, note; L. R. A. 1917E, p. 730, note; 35 L. R. A. (N. S.) 870, note; 42 L. R. A. p. 432, note; State v. Rasco, 239 Mo. 535, 567, 144 S. W. 449, 459; State v. Steely, 327 Mo. 16, 33 S. W. (2d) 938.] But while competent as circumstantial evidence to be considered in connection with other proof, bloodhound testimony alone and unsupported is insufficient to support a conviction. [8 R. C. L. sec. 177, p. 185; Carter v. State, 106 Miss. 507, 64 So. 215, 50 L. R. A. (N. S.) 1112; State v. King, 144 La. 430, 80 So. 615; Copley v. State, 153 Tenn. 189, 281 S. W. 460.]

■ It was argued below there is some evidence of the defendant's guilt to corroborate the bloodhound testimony, namely: the tracks found along the lane between the lot which was the scene of the fire and the appellant's home; the fact that instead of satisfactorily explaining why he had been up the lane and made the tracks, the appellant and his family swore to an alibi; and the fact that the appellant fled when he first saw the dogs coming.

As to the tracks. In general, evidence of this sort is competent [State v. Hall (Mo.), 231 S. W. 1001, 1004; 31 A. L. R. p. 204, note; 8 R. C. L. sec. 175, p. 183; 16 C. J. sec. 1051, p. 548.] But in this instance, the tracks did not begin at the scene of the alleged crime or lead to the home of the appellant. They were first noted in the public road near the southeast corner of the lot where the separator stood, 150 yards distant therefrom. As we understand the testimony there were only two places where tracks were found, the point just mentioned and one other place further down the lane. At any rate no tracks were found except in the lane, all leading one

way, and no tracks were discovered leading through the fields, across ditches, or over fences, along the course the dogs took; and no tracks were found in the defendant's barn lot or dooryard, although one of the dog men said he did not look for any and the other stated he did look but could not find any tracks.

■ Furthermore, there was nothing to show the tracks seen in the lane had been made by the appellant except the testimony of one of the hound masters, that he observed the tracks and later looked at the appellant's feet while the two were standing talking to each other, and that to him the feet and tracks seemed similar in size, and the appellant's shoes appeared to have rubber heels This was valueless as evidence. If a man's feet were noticeably larger or smaller than tracks found, proof of the fact would doubtless be good as negative evidence that he did not make the tracks. Or if his shoes because of their unusual shape or for some like reason would obviously leave a peculiar imprint resembling certain tracks in size and otherwise; or if the tracks led from the scene of the crime to the accused and *could* have been made by him—perhaps that fact might be shown from mere observation. But to say that without comparing measurements of the tracks and the shoes, or fitting the two together, one may merely look at a man's feet as he stands in his shoes, and assert with any degree of accuracy he made ordinary rubber heeled footprints in isolated places on dry ground— that, we say, is going too far. Indeed, there is authority for saying the circumstance alone that a man's shoes *fit* certain tracks is no proof he made the tracks, where the shoes are of average size, such as are worn by a great many people of the community. [Heidelbaugh v. State, 79 Neb. 499, 113 N. W. 145.]

It is stated in 16 Corpus Juris, section 1051, page 549, that ''without proof of prior measurements, he (a witness) may be permitted to testify as to the result of a comparison between the tracks and the feet of accused. But that does not mean the witness may qualify himself merely by viewing a man's feet. The case cited as authority for the text is State v. Graham, 116 La. 779, 41 So. 90; and an examination of the facts stated in the opinion shows the sheriff fitted the shoes of the defendant into the tracks.

■ Nor is there substantial probative value in the testimony of the two dog men that the appellant hurried or ran behind the building when he first saw them. This was not a flight in a legal sense, 16 Corpus Juris, section 1063, page 552. And in view of all the facts it was hardly a suspicious circumstance. He was going in the direction of his family. He appeared very shortly thereafter and confronted the dogs and their masters, demanding that they leave the premises. If, as the two State's witnesses said, he declared they were trying ''to frame him'' it was all the more

reason why he might have wanted to be with and protect his family —though we do not forget the whole family deny the story entirely, by saying· he was engaged in threshing and in the hayloft at the time.

To convict on circumstantial evidence alone the circumstances must be consistent with each other and with the hypothesis of the defendant's guilt, and inconsistent with every other reasonable hypothesis, including that of innocence—they must be irreconcilable with the innocence of the accused. [State v. Pritchett 327 Mo. 1143, 39 S. W. (2d) 794.] Measured by this standard we do not see how a jury could find beyond a reasonable doubt from the evidence presented that the appellant was guilty of the crime charged. The lack of convincing proof that the fire was incendiary; the fact that a painstaking investigation at the time would almost certainly have unearthed better evidence than was presented, such as footprints at the scene of the crime or at the home of the accused; and the erratic course taken by the dogs—all these make the State's evidence far from satisfying.

The State's witness Kennedy testified he heard his house dogs barking about the time of the fire. They appeared to be crowding on and then returning from someone passing in the lane 300 feet east of his house. He got up, filled his lantern—presumably with coal oil—and went to the home of Albert Freyer remaining about two hours and then returned to his own home. He must have gone along the lane. Everything in the record justified that inference, and he was the last man to travel that way. The next morning the bloodhounds, following the scent upon which they had been put, went down the lane and detoured 300 feet west to the Kennedy house and outbuildings. The hound master said in doing that the dogs were following the trail. But if the perpetrator of the arson went all the way up to the Kennedy door yard, and at a time when Mr. Kennedy was aroused by the noise and looking out, it seems the culprit would have been discovered; and it is particularly hard to understand why Mr. Kennedy's house dogs would bark at the passer-by as he traveled the lane 300 feet east of the house, and yet not pursue him with all the more vigor when he turned in and came clear up to the home they were guarding.

Allowing for the possibility that the State may be able to adduce further evidence if the case is tried again, the judgment is reversed and the cause remanded.

All concur.