THE STATE v. RICHARD WILSON, Appellant.—136 S. W. (2d) 993.

Division Two, February 21, 1940.

*Carl E. Starkloff* for appellant.

*Roy McKittrick,* Attorney General, and *Ernest Hubbell,* Assistant Attorney General, for respondent.

LEEDY, J.—Appellant was charged by indictment in the Circuit Court of Warren County, with the offense of stealing chickens in the nighttime. On his first trial the jury was unable to agree, and a mistrial was declared. Thereafter, in vacation, appellant filed an affidavit of prejudice against the judge of said court, and on the same day filed his application, with supporting affidavits, for a change of venue, based on the alleged bias and prejudice of the inhabitants of the County of Warren against him, and praying that the venue be awarded to another county in the Eleventh Judicial Circuit.

At the next term, the regular judge made an entry disqualifying himself, and calling in Hon. Ransom A. Breuer, Judge of the Thirty-Second Judicial Circuit "to preside and determine the issue in the application and affidavits of defendant heretofore filed in this captioned cause for a change of venue." On the same day, Judge Breuer being present, and assuming the bench, sustained the application for a change of venue, and ordered the venue changed to the Circuit Court of Gasconade County, in the Thirty-Second Judicial Circuit. In the latter court, upon a trial by jury, appellant was convicted, and his punishment assessed at a fine of One Hundred Dollars, and thirty days imprisonment in the county jail, and he appeals.

At the threshold of the case, we are met with respondent's insistence that the appeal must be dismissed for the reason, as alleged in its motion to dismiss, that no "written application" for

such appeal was filed. The contention is based on the fact that the record shows appellant filed his affidavit for an appeal, conforming in all respects to the requirements of the code of civil procedure in relation to appeals. (Sec. 1020, R. S. '29, Sec. 1020, Mo. Stat. Ann., p. 1295); whereas, the statute governing appeals from judgments rendered upon indictments or informations (Sec. 3740, R. S. '29, sec. 3740, Mo. St. Ann., p. 3286) requires, as a condition for the allowance of an appeal, that "defendant or his attorney of record shall . . . file his *written application* for such appeal." (Italics ours.)

The requirements of the statute with respect to appeals in criminal cases have undergone change from time to time. Under Sec. 2696, Revised Statutes 1899 (Sec. 4277, R. S. 1889; Sec. 1973, R. S. 1879; Sec. 1, p. 855, Gen. Stat. 1865) the condition imposed upon the defendant in order to perfect an appeal was simply that it be "applied for" during the term at which the judgment was rendered. This was changed by Laws 1909, page 461 (Sec. 5292, R. S. '09; Sec. 4086, R. S. '19) so as to require an affidavit precisely like that provided under the code of civil procedure, except it could not be made by an agent or attorney. The statute in its present form, requiring a "written application" was enacted in 1925.

The affidavit in the case at bar (omitting caption, signature and jurat) reads as follows: "Richard Wilson, being duly sworn, makes oath and says that the appeal prayed for in the above entitled cause is not made for vexation or delay, but because affiant believes that the appellant is aggrieved by the judgment and decision of the court." The objection that this instrument is not a "written application" for an appeal is that the affidavit "does not purport to contain a prayer for an appeal. Its reference to 'the appeal prayed for in the above entitled cause' is in the past tense, as if at some previous stage of the case a prayer for an appeal had been made." In State v. Smith, 190 Mo. 706, 90 S. W. 440, decided in 1905, under Section 2696, Revised Statutes 1899, embodying the requirement that the appeal be "applied for," it was held that an affidavit conforming to the civil code was not necessary, but in reaching that conclusion it was pointed out that, "In the country circuits the universal practice in perfecting appeals conforms to the requirements, of the statute applicable to civil cases, and affidavits are invariably filed." That practice has again grown up under the present statute, as the instant case attests. We think the filing of such an affidavit a substantial compliance with the statute, and, therefore, overrule the State's motion to dismiss.

We examine first the assignment that it was error to overrule defendant's plea in abatement, which was filed after the case was lodged in the Circuit Court of Gasconade County. The plea was bottomed on an attack of so much of the order of Judge Breuer, sitting as special judge of the Warren Circuit Court, sustaining de-

fendant's application for a change of venue (for the alleged bias and prejudice of the inhabitants of said county against him) as transferred the case out of the Eleventh Judicial Circuit, of which Warren County is a part, and into the Thirty-Second Judicial Circuit.

Appellant did not object nor except to the action of the court in ordering the case transferred to Gasconade County. He sought to raise the question of the jurisdiction of the latter court by filing his plea in abatement therein. The recent case of State v. Bailey, 344 Mo. 322, 126 S. W. (2d) 224, is squarely in point on that question. It was there said, "Nevertheless, in spite of the error, appellant is in no position to take advantage of it. There is nothing in the record showing that when Judge Barton granted the change of venue from Shannon County and sent the cause to Dent County, the appellant saved his exceptions and preserved them in a bill of exceptions in the Shannon County Circuit Court. What he did do was to attempt to raise the question after the cause had been transferred to Dent County by filing a plea to the jurisdiction in the circuit court of that county. This was futile. The point must be raised and saved in the court where the change of venue was ordered. [State ex rel. Wolfner v. Harris (banc), 312 Mo. 209, 278 S. W. 669.]" The point is, accordingly, ruled against appellant.

█ The serious question in the case is whether appellant's challenge of the sufficiency of the evidence is to be sustained, and this necessitates a rather lengthy resume of the facts. Nellie Winters lived on a farm with her two brothers, T. J. and William Morrisey, some six miles northwest of Warrenton, in Warren County. On the night of October 24, 1938, the night in question, the dogs were heard to bark, but no effort was made to ascertain if there were intruders on the premises. The next morning, about nine severed heads of Plymouth Rock chickens, the kind kept by Mrs. Winters, were found, with blood and feathers, some sixty or seventy yards back of the henhouse. Two of the heads, by reason of particular markings, were identified as being of Mrs. Winters' flock. Two sets of footprints were found in the dust around the henhouse, and these were tracked or trailed. T. J. Morrisey testified that he first took up the trail, and that the tracks crossed the fence dividing the Winters and Beeker premises, and were lost in a meadow, which was perhaps forty yards wide. They were again taken up where they crossed Beeker's plowed field, and followed seventy-five or eighty yards into the county road going northeast, where the tracks were again lost. Some seventy-five or eighty yards down the road tracks of the same kind were found going into Schwartz' field, which had been plowed and sowed in wheat. There he stopped and went back home. In the afternoon of that day, when the officers arrived, including the sheriff and a highway patrolman, the search was resumed at the place Morrisey found the tracks leading into Schwartz' wheat field.

The tracks were followed some seventy-five or eighty yeards across Schwartz' wheat field until another meadow was reached. It was about eighty yards across this meadow. The tracks were found entering Schwartz' cornfield, and followed therein some two hundred yards until another meadow was reached where the trail was lost, and further efforts to follow the tracks were abandoned. The latter point was, under the State's evidence, at least five hundred yards from appellant's home, and according to defendant's evidence a half mile. By a compilation made by respondent, it appears that with the breaks as hereinabove detailed, the tracks were discernible and actually followed for one thousand and eighty feet out of a total distance of two thousand nine hundred and seventy feet from the first meadow referred to to appellant's home, or slightly in excess of one-third of the distance. Where the trail was abandoned, and about five feet from where it was lost "the same tracks" were found going *toward* the Winters place, and the same was true in the Schwartz cornfield. There was also some testimony to the effect that "barred rock" feathers were found from place to place along the trail followed.

Of the two sets of footprints, one was small (about nine inches long) and had been made by a shoe having a smooth leather sole, and bore no distinctive markings. The other, allegedly that made by appellant, was described as being unusally large—"awful big—the biggest track I had ever seen" was the way it was put by T. J. Morrisey. It was measured by the witness William Morrisey, and found to be "13 inches or better" in length, and about 4 inches in width. The testimony was to the effect it had been made by a shoe with a composition sole. The pattern or design left on the ground showed that it had bars or ridges running across the sole, and the heel had four "dots," "buttons," "lumps" or "nail holes" on each side. There was some evidence as to the peculiar and distinctive nature of the large footprints, in that, as described by the highway patrolman, "the right foot was spread out a little more than the other, as though the weight was more on the right foot than on the left." This was observed by at least one other witness. It should be stated that the weather was described by some of the witnesses as "fine." The government observer of the weather bureau at Warrenton testified that the rainfall during October, prior to the 24th, was 2.54 inches; that the last rainfall before the 24th was on the night between the 18th and 19th, when 1.67 inches fell.

The plat showing the route taken by the witnesses in following the tracks, which apparently showed the several fields, meadows and the road in their proper setting in relation to the premises in question and the home of appellant, was not included in the transcript on appeal, nor do those facts otherwise clearly appear in the record. It would, seem, however, that appellant lived some distance northeast of the Winters place—perhaps a mile or more, and that the trail referred to ran generally in that direction.

The only measurement made of the footprints was by William Morrisey. No effort was made to take plaster casts, or otherwise preserve specimens of the prints. Nor was any effort made to see whether corresponding prints were at or about appellant's premises. The failure of the officers to go to appellant's home was, as one of the officers explained, "because a man said he met him going to town." As stated, the trail was abandoned at least five hundred yards from his place.

John Lovall, appellant's co-indictee, owned the place whereon the latter lived with his two young sons. There was no house on the premises, but the father and sons were "batching" in what was described as a chicken house. They had moved there early in the month of October, 1938, or about three weeks before the date of the alleged offense. Lovall lived in St. Louis, but apparently made frequent trips to the place where appellant was living. It was shown by the bus station agent at Warrenton that on the afternoon of October 25, just before the 1:05 o'clock eastbound Greyhound bus arrived, appellant and Loval came walking to the station together; that appellant was carrying a basket, and when they reached the station it was turned over to Lovall who boarded the bus and went to St. Louis. The basket was described as "just a regular market basket, one of those split baskets," and from its appearance "it seemed very heavy." It was covered with paper.

On November 9, 1938, appellant passed William Morrisey walking in a dusty road. After he had passed, Morrisey examined the tracks so made by appellant, testified that although he "did not measure exactly, but I took my finger down like this . . . but I took it to be the same track, it looked that way to me."

John Schwartz testified he examined the footprints in his field the day after the chickens were stolen, and described the larger track in this way: "The big one walked with his tracks kind of out that way. He set his feet out." He further testified that he saw that track again when appellant came to his house to subpoena him, and that the latter was made by appellant. However, he testified he did not count the bars on the sole at that time nor when he first saw them in his field. The highway patrolman testified similarly touching tracks he saw made by appellant on October 27, on the Truxton Road. Like the witness Schwartz, he did not know how many bars or ridges across the sole were left by either imprint, and did not measure either of them. Two other witnesses testified they saw appellant walking in a road on October 31, and that the sole of his shoe made an imprint having bars across it.

It was shown that appellant's business was largely that of selling dressed chickens, and that he had been so engaged for some considerable time. There was some conflict in the evidence as to how many he raised. It was not shown that he sold any chickens immediately following, or about the time of the alleged theft.

Appellant denied his guilt, and undertook to show by his two sons, aged thirteen and fifteen, that he did not leave the house on the night in question. He also undertook to show that the occasion when Lovall returned to St. Louis by bus, carrying a basket, was about a week later than the date fixed by the bus station agent, and furthermore that the basket contained canned blackberries. He denied having shoes with composition soles, or any such as would make prints of the type referred to by the State's witnesses, and in this he was corroborated to some extent by his shoe dealer.

Upon a consideration of the foregoing facts, we are constrained to hold that verdict cannot stand. The evidence was abundant to show the commission of an offense, i. e., the felonious taking of Mrs. Winters' chickens in the nighttime, but to say that the evidence is sufficient to convict the appellant as the perpetrator is going too far. The very first link in the chain is exceedingly weak, in that in abandoning the search for footprints five hundred yards from appellant's home it, at best, to connect him only remotely. It was not followed by an investigation on his premises looking toward a comparison with footprints that might have been found there, nor was any search made for the missing chickens. The link showing the co-indictee the next day boarded a bus with a basket is, in the absence of other corroborating evidence, entirely too weak. If, as the State implies, the basket contained dressed chickens, doubtless evidence of recent dressing operations could have been developed. The rule is well established that conjecture, suspicion or surmise is not sufficient as a basis of conviction. [State v. Carter (Mo.), 36 S. W. (2d) 917; State v. Eklof (Mo.), 11 S. W. (2d) 1033.] Moreover, "to convict on circumstantial evidence alone, the circumstances must be consistent with each other and with the hypothesis of the defendant's guilt, and inconsistent with every other reasonable hypothesis, including that of innocence—they must be irreconcilable with the innocence of the accused." [State v. Freyer, 330 Mo. 62, 48 S. W. (2d) 894; State v. Pritchett, 327 Mo. 1143, 39 S. W. (2d) 794.] In our opinion, the evidence adduced, while creating a suspicion of guilt, is inconclusive and fragmentary, and under the authorities, must be held insufficient to sustain the conviction.

Other errors assigned are of such nature that they are not likely to recur upon another trial, and as it does not appear that the State would be unable to produce additional evidence in the event of a retrial, we, therefore, reverse the judgment, and remand the cause. All concur.