THE STATE v. RAY SCHRUM, Appellant.—152 S. W. (2d) 17.

Division Two, June 10, 1941.

. *David E. Impey* and *John P. Moberly* for appellant.

*Roy McKittrick,* Attorney General, and *Max Wasserman,* Assistant Attorney General, for respondent.

LEEDY, J.—Appellant was charged by information in the Circuit Court of Texas County with having stolen, on or about June 2, 1938, in the nighttime, seventeen chickens, the property of Dow Clayton, from the messuage of said Clayton, in violation of Section

**1062**

4066, R. S. '29 [Sec. 4066 Mo. Stat. Ann., p. 2871.] Upon a trial at the March, 1940, term of said court, he was found guilty as charged, and, from the judgment sentencing him to a term of two years in the penitentiary, in accordance with the verdict of the jury, he prosecutes this appeal.

The first and main question presented is that of the sufficiency of the evidence to support the verdict, the contention being that the proof fails to connect defendant with the larceny. In that behalf the State's brief says, "Respondent concedes that the question of the sufficiency of the evidence is close, but submits that the facts and circumstances are consistent with appellant's guilt and that a case was made out for the jury." The facts are brief, and, insofar as pertinent to this inquiry, may be stated as follows:

The prosecuting witness, Dow Clayton, lived on a sizable farm in Texas County on the west side of U. S. Highway 63. A quarter of a mile south of his residence there connects with, and extends east from said highway, an improved farm-to-market road known as Texas County highway "V." During the night in question, between 3:00 and 5:00 A. M., and before daylight, Clayton was awakened by his wife. He got up and went outdoors, and took a position midway his residence and hen house. He stood there a few minutes and nothing developed. He neither saw nor heard anyone in the chicken house. Nevertheless he "hollered, 'Drop them right where you're at; I have got it on you.'" Whereupon, he "heard a noise that sounded like a runaway team start . . . and they run into a gate" some 40 or 60 feet from the hen house. The witness then went to the gate and there found two burlap sacks containing chickens, which he counted and liberated. Further search disclosed a flashlight and hat on the ground near the gate. Inside the chicken house three more sacks were found. The witness then got in his car and waited to start it until his son heard a car start at or near junction of highways 63 and "V" south of his residence, which car traveled east on county highway "V." The car was not seen by Clayton and his son, Roy, but was merely heard. Dow Clayton gave pursuit. He drove south on 63 to its junction with "V" then turned east on the latter road. After he had driven east a quarter of a mile on "V" and "topped the hill at Frank Jones" he was "on the level for two miles and a half" and there for the first time saw the lights of a car, "so then I·kicked the gas down to the floor board . . . I knew I had three miles of highway there to travel on straightaway . . . There was just one turnoff there (by Wurlow's) . . . I overrun that. There was just one turnoff there and when I overrun that I whirled and come right back and when I come back they took a side road on me." He then went to the residence of Frank Jones and got Jones to accompany him "back to where they had left the highway and just as I started to turn in, my lights come on this car and it was

there." The car was found to be unoccupied and "stuck" in a mudhole. In that connection he testified as follows: "Q. You didn't recognize the car that went away from your house, did you? A. No, sir. Q. And you didn't keep in sight of that car all the time until you found the car you have described, did you? A. I kept in sight of it until I overrun it when it turned in, it fooled me and I passed it. Q. Well, Mr. Clayton, the truth about the matter is this: you started out to follow a car and you lost sight of it, didn't you? A. Yes, sir. Q. And then later you found a car on the side road? A. Yes, sir."

Other neighbors and the officers were aroused and came to the scene of the stalled car, a Model A 1930 or 1931 Ford coupe. Two burlap sacks had been tied around the wheels "with chicken feathers all over the sacks." The license plates had been removed "right there" and the motor number had "been fresh chiseled off, right fresh." A chicken coop was found in a thicket about twenty feet from the car. When placed in the back end of the coupe it was found to fit so as to permit the lid to close down and nothing would be in sight. An envelope was found in the car on which appeared the name of "Leland Sutton," and in the envelope there was a summons or petition in a divorce suit wherein he was mentioned, presumably as a party. In the back end of the car were numerous tools, namely: A blowtorch, two or three hand saws, an axe, a couple of cans, one containing cylinder oil, and the other "possibly gasoline," a pinch bar or nail puller, chisels, files, a hammer, some wedges and "a lot of feathers in the bottom of the back of the car." Also found in the car were the following articles upon which much emphasis has been placed: A sprayer together with a can containing a preparation known as "flowers of sulphur," and an "agricultural" book relating to livestock, poultry and farming, in the front of which appeared the name "Ray Schrum, West Fork," and also the name "Elmer Schrum." There was testimony to the effect that the preparation above referred to, when sprayed upon chickens, has the effect of making them groggy, and rendering them unable to squawk or squall so that "you could just reach over and pick them up."

While not definitely shown, the implication is clear that defendant lived elsewhere than in Texas County. For aught that appears in the record, he was never seen within that county until after his arrest. There was testimony to the effect that between 4:00 and 5:00 in the afternoon or evening preceding the alleged larceny a car answering the general description of the abandoned Ford coupe was seen parked at the intersection of highways 63 and "V," and in it were two men and a girl or woman. The occupants were not further identified. The witness Frank Jones testified that at about 4 o'clock on the morning in question, and shortly before Clayton came to his residence, he was awakened by the passing of a "Model A" car on highway "V"

which runs in front of his house; that he could tell by the rattle of the car that it was a Model A, and that he could distinguish between the rattle of such a model and a Model T or a V-8.

Defendant was apprehended in October, 1938, at Valley Park, near the City of St. Louis, at the behest of Texas County authorities. While being taken to Texas County by a highway patrolman and the sheriff he is alleged to have made an admission which, coupled with the other facts of the case, the State contends is sufficient to make the matter of his connection with the larceny a question for the jury. The facts touching that subject were testified to by the sheriff as follows: That the witness and the patrolman were riding in the front seat of the car, and defendant, who was in their custody, was riding in the back seat; they were on U. S. Highway 66 near Rolla when they "pulled off" of the highway some fifty yards at what is known as Sand Springs, ostensibly for the purpose of getting a drink of water; that while parked there they questioned defendant as to the ownership of the car which was found in Clayton's neighborhood the night of June 2, and that "He (defendant) said the car belonged to him." On cross-examination it was developed that defendant at that time and place further said he was not driving the car that night; that he was not at Dow Clayton's, and, in substance and effect, that he did not steal or attempt to steal the chickens in question.

The sheriff took charge of the abandoned Ford and it was towed to the county seat where it still remained at the time of trial. In the meantime it was not claimed by anyone. While defendant was in jail awaiting trial he was questioned by a deputy sheriff with respect to the ownership of the car. The deputy testified in that connection, as follows: "Q. Just tell the jury what he told you about the ownership of the car. A. Well, I asked him one time if he knew his car was here and he said he did not; I asked him another time the same question and he said he knew it was here, but he loaned it to a fellow; and then I asked him another time the same question and he said that he—a fellow stole his car from him."

These excerpts from the testimony of the prosecuting witness further reflect the state of uncertainty surrounding the connection of defendant with the larceny:

"Q. You didn't see anybody in your chicken house, did you? A. No, sir.

"Q. You didn't see anybody leave your chicken house, did you? A. No, sir.

"Q. You didn't see this defendant that night at all, did you? A. No, sir.

"Q. And you will not identify this defendant as having been at your place, will you? A. No, sir.

"Q. You will not identify him as having been in that car, will you? A. No, sir.

"Q. And you will not positively identify this [the abandoned car] as the same car that you thought you heard leave from near your place, will you? A. No, sir.

"Q. But you don't know the fellows—you can't really say whether the fellows that tried to steal your chickens was afoot, horseback, in a buggy, wagon, or had a car parked, do you? A. No, sir, I don't."

At the close of the State's case, defendant offered a demurrer, which was overruled. Whereupon, defendant stood on his demurrer, and introduced no testimony.

█ We have attempted to state the facts in the light most favorable to the State, as is the rule in testing the sufficiency of the evidence on demurrer. [State v. Myers (Mo.), 44 S. W. (2d) 71.] From such statement, it will be seen that the main circumstance pointing to defendant's guilt is his admission of *ownership* of the car, containing the articles hereinbefore enumerated, which the facts show was found mired and abandoned more than two miles from the scene of the alleged larceny. █ It is axiomatic that in cases where, as here, conviction is sought on circumstantial evidence alone, "the circumstances must be consistent with each other and with the hypothesis of the defendant's guilt, and inconsistent with every other reasonable hypothesis, including that of innocence—they must be irreconcilable with the innocence of the accused." [State v. Wilson, 345 Mo. 862, 136 S. W. (2d) 993; State v. Freyer, 330 Mo. 62, 48 S. W. (2d) 894; State v. Pritchett, 327 Mo. 1143, 39 S. W. (2d) 794.] Measured by this test, can it be said that the showing relied on by the State is irreconcilable with the hypothesis of the innocence of the accused? We think not. █ It may be conceded, for present purposes, that the evidence is sufficient to justify the inference that the abandoned car was the one in which the thief or thieves made their getaway, although that showing is not conclusive, under the testimony of the prosecuting witness, and because of certain inferences not favorable to the State which we have not set out. But this is not enough. In order to directly connect defendant with the crime it is necessary to infer, also, that from his admission of ownership of the car, he was present and participated in the larceny; and this, we hold, is not a permissible inference. █ It seems clear that the facts and circumstances shown in evidence do nothing more than raise a suspicion, of defendant's guilt, and, of course, a verdict based on suspicion, conjecture or surmise will not be permitted to stand. [State v. Wilson, supra; State v. Carter (Mo.), 36 S. W. (2d) 917; State v. Perkins (Mo.), 18 S. W. (2d) 6; State v. Eklof, 321 Mo. 548, 11 S. W. (2d) 1033.] There being no substantial evidence of defendant's guilt, his demurrer to the evidence should have been sustained. Accordingly, the judgment is reversed, and as it does not appear that upon another trial a submissible case might be made, the defendant is ordered discharged. All concur.