**STATE of Missouri, Respondent,**

v.

**William Chapman OLIVER, Appellant.**

**No. 60617.**

Supreme Court of Missouri,
En Banc.

Oct. 10, 1978.

Rehearing Denied Nov. 6, 1978.

J. Martin Hadican, Clayton, for appellant.

John D. Ashcroft, Atty. Gen., Jeff Schae-perkotter, Asst. Atty. Gen., Jefferson City, for respondent.

JOSEPH J. SIMEONE, Special Judge.

I.

Defendant-appellant, William Chapman Oliver, was charged by information and found guilty by a jury of murder in the second degree, Section 559.020, RSMo 1969. In accordance with the jury verdict entered October 31, 1975, defendant was sentenced on January 23, 1976, to 20 years in the division of corrections. He appealed to the Court of Appeals, Springfield District, which affirmed the conviction. On appellant's motion, we granted transfer of this cause and now decide the case under the provisions of Article V, § 10, Mo.Const.; Rule 83.03.

Appellant urges two points for reversal: (1) that the trial court erred in overruling his motion for continuance made at the beginning of trial to allow appellant a reasonable opportunity to convince a reluctant out-of-state witness to voluntarily return to Missouri to testify on his behalf, and (2) the trial court erred in giving Instruction No. 6—a manslaughter instruction (MAI–CR 6.08). We reject both points and, for reasons hereinafter stated, affirm the judgment of conviction.

II.

On October 28, 1971, Marilyn Oliver, the estranged wife of the defendant was found dead on a farm in Franklin County. Her body was partially decomposed and an autopsy showed she had been shot five or six times.

On August 31, 1972, defendant, William Chapman Oliver, was indicted for the murder by a Franklin County grand jury. The indictment charged defendant with shooting to death his estranged wife with a .38 caliber revolver on or about October 19, 1971.

On February 5, 1973, upon defendant's motion, a change of venue was granted to Phelps County and the jury, on August 31, 1973, found defendant guilty of murder in the second degree and assessed his punishment at 25 years imprisonment. By mandate of the court of appeals, this judgment was reversed and the cause remanded for a new trial. *State v. Oliver*, 520 S.W.2d 99 (Mo.App.1975). The cause was retried and the defendant was found guilty and the jury assessed his punishment at twenty years.

Before the trial of the present cause, a change of venue was granted to Dent County. An information in lieu of indictment was filed charging defendant with second degree murder.

Trial of this cause commenced on October 28, 1975. Since defendant does not question the sufficiency of the evidence we need not detail all of the complicated facts. Suffice

it to say that the jury could reasonably find the following. At the time of the critical events in 1971, defendant was a police officer in the City of St. Louis. He married Marilyn in the Spring of 1967 and they lived together until late 1970 or early 1971. At the time of the events in question Marilyn was living in an apartment in Florissant, Missouri. Mr. Oliver and one Richard Woodcock were sharing an apartment at another location. Marilyn was employed at a baking company.

The events are difficult to detail. Much of the evidence by various witnesses focused on the defendant owning or having in his possession over a period of time a nickel or chrome plated pistol with white grips—exhibit 18, the murder weapon, and testimony of witnesses who stated that defendant had made certain incriminating statements about killing his wife. There was also evidence that the defendant had purchased "Norma brand" bullets—the same kind of bullets found in Marilyn's body and fired from exhibit 18. There were also some discrepancies in certain interviews the defendant had with police officers of the Major Case Squad.

Prior to the time Marilyn's body was found on a farm on October 28, 1971, Marilyn's younger sister, Shirley Jean Folle, stayed with Marilyn on the weekend of October 16, and 17, 1971. Shirley described the clothing Marilyn had on at the time which was the clothing she had on when her body was found. Two witnesses testified that they took Marilyn to dinner on the evening of October 18, and returned to her apartment at about 11:30 p. m.

On the next Wednesday, October 20, an officer of the St. Louis Police Department—Officer Brooks—stopped the defendant when he was speeding. Defendant was off duty. At the time Brooks noticed the defendant carrying a "nickel or chrome plated pistol with white grips." The officer testified that the gun, exhibit 18, "most definitely" resembled the gun defendant was carrying.

The scene then shifts to a bank robbery. On October 21, 1971, an armed robbery occurred in the city at Cass Federal Savings and Loan Association. The defendant was on duty and heard a broadcast about the robbery. The broadcast contained a reference to a license plate which was familiar to defendant because it was on an automobile driven by Marilyn. A second broadcast mentioned the name of James Leroy Cochran, who, defendant knew, was acquainted with Marilyn.

October 28, 1971, was a fateful day when many facts coalesced. On that day a special agent recovered the gun introduced in evidence from an abandoned automobile in Kentucky. The automobile had been left by Cochran who was wanted for the Savings and Loan robbery.

On that same day, a farmer discovered the partially decomposed body of Marilyn near Gerald, Missouri. The body was clad in the same or similar clothing Marilyn had worn. Police were called. The next day an autopsy was held. The body showed evidence of at least five bullets and perhaps six. One perforated the heart.

One of the state's witnesses was Brenda McCleary. She was endorsed a few days before trial. It was her testimony that she and a friend, Mary Duvall, knew defendant and that the defendant possessed a nickel plated gun. Brenda testified that defendant made some incriminating statements concerning his wife's death.

At the time of the trial, Brenda's friend, Mary Duvall was residing in Georgia and was reluctant to come to Missouri to testify. Her deposition was taken by telephone and read. She did not remember Brenda telling her of any of the incriminating statements made by defendant.

Damaging testimony came from Kathleen Ann Cookson (Gilliam), a lifelong friend of Oliver's girlfriend, Sandra. She testified that the defendant said that if Sandra's husband would injure Sandra or his children, he would "pump them full of lead, like his wife." She also testified that Oliver said, "Oh, my God! What have I done? I've killed my wife . . . ."

Over the months, the investigation into Marilyn's death was carried on under the supervision of Major Robert R. Lowery and Officer Jay Noser. Officer Lowery testified as to certain interviews with the defendant in which the defendant first denied purchasing Norma brand bullets and then admitted it. Testimony also indicated that the defendant had not been honest in an earlier interview, and that defendant had made statements about throwing the remaining bullets away.

On May 12, 1972, approximately seven months after Marilyn's death, defendant was interviewed by Major Lowery, and Detective Jay Noser. Defendant appeared voluntarily for the interview at Lowery's request, and the interview was conducted in Lowery's office. At the outset, Officer Lowery advised defendant of his constitutional rights, after which Officer Lowery asked defendant if he knew how Marilyn met her death. Defendant replied he did not. Lowery then asked defendant when he first became aware that Marilyn had disappeared. According to Lowery, defendant explained he was on duty on October 21, 1971, and heard the police radio report of the Cass Federal holdup. Lowery testified defendant said he recognized the license number as being the one on "Marilyn's car". Lowery recalled that defendant said he had seen the license plate at least ten or fifteen times. According to the officer, defendant said he knew James Cochran "slightly". Lowery testified he then asked defendant if he had any Norma brand bullets and defendant replied "No." At this time, Lowery told Noser to bring Sandra Little into the office. When Sandra entered, Officer Lowery recalled defendant saying "I told you, Sandra, to throw the bullets away, the remaining bullets . . . away in a sewer."

Officer Noser corroborated Officer Lowery's version of the May 12, interview, adding that defendant was asked if he ever owned or had a chrome plated gun, and defendant replied he never owned one. Officer Noser quoted defendant as saying he had no knowledge of purchasing any Norma brand bullets at any time. Noser recalled defendant saying he lied to Lowery about purchasing bullets to protect Sandra.

Defendant's recollection of the interview on May 12 was that Lowery asked about the Norma ammunition and defendant did not remember buying any, so he replied "No." At trial defendant admitted buying ammunition from a gun shop on several occasions. Defendant testified that Norma brand ammunition can be used in any .38 caliber "police special" and defendant admitted owning several such weapons. Defendant denied telling Lowery he lied to protect Sandra.

On July 20, 1972, defendant returned to the Police Station and asked to see Major Lowery "to find out more about the case". On this occasion, according to Lowery, defendant said he had purchased the Norma brand bullets and "he had not been honest with me on the first interview because of Sandra Little and that Sandy Little had given the weapon used in the commission of these crimes to James Leroy Cochran . . . ."

Sergeant Noser was present at the July 20, 1972, meeting between Major Lowery and defendant. Noser quoted defendant as saying he lied about the bullets to protect Sandra Little. Noser also recalled defendant saying the gun they had discussed on May 12 belonged to Sandra Little, and she had given it to James Cochran.

Brenda McCleary, a state's witness who was endorsed a few days before trial testified. It was her testimony that she and her friend Mary Duvall met defendant about a week before Halloween, 1970. Brenda recalled that she and Mary were standing on a corner one evening and defendant and another officer, both in uniform drove up in a patrol car. Defendant introduced himself and invited Brenda and Mary to go for a motorcycle ride on Halloween night. Brenda was eighteen at the time. On Halloween night defendant met Brenda and Mary at Brenda's residence and Brenda "went for a motorcycle ride with him first." While she was seated behind him she "felt something over on the side" and asked him what

it was. Upon stopping defendant showed Brenda a gun. The weapon was described as a "chrome or nickel plated pearl handle . . ." Defendant took it out and tossed "it from one hand to another . . . kind of juggling it back and forth." This went on for "about five or ten minutes." Brenda questioned him—"you know, asking what for, for what protection and he says he didn't know if he should bust anybody for drugs or not." When asked what he meant by that, Brenda stated "He didn't give me any answer and he said his wife knew too much and that he had to get rid of her himself, and that he would do it." Brenda identified the gun introduced in evidence as the gun defendant was carrying on that Halloween night. When the two returned to Brenda's residence, "he said that if he could he would dance at his wife's funeral . . ." Brenda testified that she told Mary Duvall about defendant's statement the next day.

At the time of trial Mary Duvall was residing in Georgia and was reluctant to come to Missouri to testify. Her deposition was taken by telephone. The deposition was read. Mary recalled first meeting defendant at a hamburger restaurant where she was employed. She could not remember the year, but believed the month was October. According to Mary, the meeting occurred when Brenda came to the restaurant with defendant to "pick me up". Mary remembered going for a motorcycle ride with defendant one Halloween but was unable to recall the year. She did not remember defendant coming to Brenda's house and taking Brenda for a ride, nor did she remember leaving from Brenda's house for a motorcycle ride with defendant. Mary also did not remember Brenda quoting defendant as saying he would dance at his wife's funeral. Neither did she remember any discussion with Brenda concerning a pistol Brenda saw defendant carrying.

The defendant testified. He contradicted the testimony of many of the state's witnesses and denied he ever had a chrome plated gun. He testified that the witnesses against him in stating certain facts had been "mistaken". He denied killing his wife.

On the morning of trial, October 28, 1975, defendant filed a motion for continuance alleging that a few days before, on October 22, 1975, the state notified defense counsel that the State intended to endorse Brenda McCleary as a witness and that the state would make the witness available for deposition. The motion further alleged Brenda's deposition was taken on October 25, and during the course of the deposition, she stated that Mary Duvall was present with her during certain conversations between defendant and Brenda McCleary. The motion alleged that efforts were made to contact Mary Duvall and that defense counsel "ascertained" from her that she did recall certain events, but did not recall any conversation wherein defendant made certain incriminating statements. The defense therefore requested a continuance. Defendant requested that he be "granted a reasonable time within which to secure the presence of . . . Mary Duvall, who he understands is presently residing in the State of Georgia" in an attempt to refute the testimony of Brenda.

In explanation of his motion for continuance, defense counsel told the court that during a telephone conversation with Ms. Duvall she stated she did not want to return to Missouri to testify. The Special Prosecutor, who evidently also spoke with Mary advised the court that Mary "steadfastly does not wish to return to the State . . . . ."

The court overruled the motion for continuance but recommended that arrangements be made to "depose her by way of phone." A telephone deposition was obtained from Mary on the afternoon of October 29, 1975, and was read into evidence, the substance of which is stated *supra*.

At the conclusion of the trial the court gave Instruction No. 5, the second degree murder instruction, MAI–CR 6.06 and Instruction No. 6—manslaughter, MAI–CR 6.08. The cause was argued, the jury retired and after deliberation the defendant was found guilty of murder in the second

degree and his punishment was assessed at twenty years. After overruling the motion for new trial, and granting allocution, the defendant was sentenced.

### III.

As to the continuance issue appellant makes the point that the court erred in refusing the defendant a reasonable opportunity "to convince Mary Duvall to voluntarily return" to Missouri to testify on his behalf because the denial of the continuance violated his Sixth Amendment "compulsory process rights", due process and Missouri constitutional rights to secure the attendance of witnesses, guaranteed by the Sixth and 14th Amendments of the U.S. Constitution and Art. I, § 18(a) of the Missouri Constitution.[1]

Defendant cites no case directly in point which would authorize a continuance to allow the defendant a reasonable opportunity to convince a witness to voluntarily return to the state. Defendant concedes that legal process to compel the attendance of Mary Duvall was lacking at the time of trial because she was in Georgia and outside the subpoena power of Missouri.

We hold that the trial court did not err in denying the continuance under these circumstances.

■ First, it is true that the right of a defendant under the Sixth Amendment to have compulsory process for obtaining witnesses in his favor is applicable to the states through the Fourteenth Amendment, *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). That case, is not, however, dispositive of the issue here. Here the witness, Ms. Duvall was outside Missouri; she steadfastly refused to return to the state; she was deposed by the defendant by telephone after the defendant had taken the deposition of Brenda

McCleary. In this case the trial court did not need to speculate about Mary Duvall's attitude about returning. She had personal reasons for not returning. She expressed herself to counsel for both sides in unequivocal terms. She had no intentions to do so. Neither at trial nor on appeal did defendant suggest how he could have persuaded Mary to return or how much time would be needed to convince her to do so. She was deposed by telephone and her deposition was read.[2]

Second, the trial court did not err in denying the continuance because the motion did not comply with the requirements of Rule 25.08 in all its particulars. *State v. Lynch*, 528 S.W.2d 454 (Mo.App.1975).

■ Third, an application for continuance in a criminal case is addressed to the sound discretion of the trial court. *State v. Perryman*, 520 S.W.2d 126, 128 (Mo.App. 1975); *State v. Collie*, 503 S.W.2d 445, 446 (Mo.App.1973). The appellate court will not interfere unless it clearly appears that such discretion has been abused. *State v. LeBeau*, 306 S.W.2d 482, 486 (Mo.1957). This principle is applicable when the continuance is sought to enable the defendant to produce an absent witness under subpoena[3] and where the witness is not under subpoena. *LeBeau, supra.* One of the issues for the court to consider in ruling on such a motion is whether there is a reasonable probability that the personal presence of the witness will ever be obtained. In *LeBeau*, in affirming the trial court's denial of a continuance, we observed that the last known address of the witnesses were outside Missouri, thus beyond the jurisdiction of any process and that there were no facts to support satisfactorily the contention that the witnesses would voluntarily return to Missouri to testify. *LeBeau*, 306 S.W.2d at

1. He relies on several decisions including *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *State v. Lee*, 491 S.W.2d 317 (Mo. banc 1973); *State v. Schrum*, 347 Mo. 1060, 152 S.W.2d 17 (1941); and *State v. Morse*, 515 S.W.2d 608 (Mo.App.1974). The state's brief does not address this issue.

2. As to confrontation see discussion in *State v. Brooks*, 551 S.W.2d 634, 652–653 (Mo.App. 1977). The authorities relied on by the appellant are not controlling, e. g., *Ross v. State*, 504 S.W.2d 862 (Tex.Cr.App.1974).

3. *State v. Reece*, 505 S.W.2d 50 (Mo.1974).

487. "[I]t requires a very strong showing to induce the higher court to interfere, and it will disturb the action of the trial court only where a clear abuse of the discretion is shown." *State v. Thomas*, 433 S.W.2d 537, 539 (Mo.1968) quoting from *State v. Amerison*, 399 S.W.2d 53, 55 (Mo.1966).

We find no infirmity or abuse of discretion here. Under the circumstances the court did not err in denying the motion for continuance.

### IV.

As to his second point, appellant urges that there are two separate issues presented: (1) whether a defendant who has been charged with and found guilty of second degree murder may complain of the giving of a manslaughter instruction and (2) if he can whether the trial court may give an instruction on manslaughter when there "is no evidence at trial to support a conviction for manslaughter."

The issue on this point is whether, defendant having been found guilty of second degree murder may complain of the giving of a manslaughter instruction.

On this specific issue the law has been steadfast and unchanging. The principle adhered to for over a century has been and is that there can ordinarily be no reversible error in the giving of a manslaughter instruction where the jury has found the defendant guilty of first or second degree murder.[4] Appellant suggests that the court in giving a manslaughter instruction intimates to the jury that the defendant is guilty of some crime. That is not the case. It is a "forced" construction. *Emory*, 246 S.W. at 952. The court did not express an opinion as to the guilt or innocence of the defendant. The jury did not convict the appellant of manslaughter, hence the defendant could not have been prejudiced. We adhere to this principle which has been established over the years. Later decisions relied upon by the appellant have not diluted that principle. We therefore rule this point against appellant.

### V.

The second portion of this point raised by the appellant is that the court erred in giving the manslaughter instruction because there was "no evidence at trial to support a conviction for manslaughter." Since the defendant is in no position to complain of the giving of an instruction on manslaughter we need not resolve this subpoint.

The judgment is affirmed.

All concur.

---

4. *State v. Davis*, 400 S.W.2d 141, 150 (Mo. 1966), cert. den. 385 U.S. 872, 87 S.Ct. 142, 17 L.Ed.2d 99 (1966); *State v. Mayberry*, 272 S.W.2d 236, 243 (Mo.1954); *State v. Bledsoe*, 254 S.W.2d 618, 621–622 (Mo.1953); *State v. Emory*, 246 S.W. 950, 952 (Mo.1922); *State v. Snead*, 259 Mo. 427, 168 S.W. 602, 603 (1914); *State v. Baker*, 246 Mo. 357, 152 S.W. 46 (1912); *State v. McMullin*, 170 Mo. 608, 71 S.W. 221 (1902); *State v. Goddard*, 162 Mo. 198, 62 S.W. 697, 708 (Mo.1901); *State v. Dunn*, 80 Mo. 681, 693 (1883). There is a possible exception if error exists in the manslaughter instruction itself, thereby preventing the jury from convicting on manslaughter. *State v. Brooks*, 360 S.W.2d 622, 628 (Mo. 1962). There is no such contention herein.