**STATE of Missouri, Respondent,**

**v.**

**Earl E. STONER, Appellant.**

**No. 51150.**

Supreme Court of Missouri,

Division No. 1.

Oct. 11, 1965.

Norman H. Anderson, Atty. Gen., Jefferson City, Donald L. Manford, Asst. Atty. Gen., Kansas City, for respondent.

Charles A. Moon, Springfield, for appellant.

HIGGINS, Commissioner.

Earl E. Stoner was convicted as charged by the information of concealing mortgaged

property of the value of $2,800, a felony, and the jury assessed his punishment at 2-years' imprisonment. Section 561.570, RSMo 1959, V.A.M.S. Sentence and judgment followed and defendant has appealed.

Respondent contends that the appeal should be dismissed for failure of appellant to file a timely motion for new trial. Criminal Rule 31.01, V.A.M.R., provides that in computing time, the day of the act, event, or default after which the designated period of time begins to run is not to be counted or included, and the last day of the prescribed time is to be counted or included unless such last day be a Sunday or a legal holiday, in which event the period runs until the end of the next day which is neither a Sunday nor a legal holiday. The verdict in appellant's trial was received October 16, 1963, and the time for filing motion for new trial was properly enlarged as provided in Criminal Rule 27.20(a), V.A.M.R., until on or before November 25, 1963. Appellant's motion for new trial was filed November 26, and such late filing would preclude review unless November 25, 1963, was Sunday or a legal holiday. We take judicial notice that November 25, 1963, was proclaimed by President Lyndon B. Johnson to be a National Day of Mourning for the State Funeral of John F. Kennedy, 34th President of the United States. November 25, 1963, was thus constituted a holiday, the courts were not open for business and appellant's motion, ordinarily due on that date, was properly and timely filed the following day. See Shannon County ex rel. Winona Consolidated School Dist. v. Shannon County Bank, 229 Mo.App. 895, 86 S.W.2d 1070, 1072 [2, 3], and cases there cited.

The main question presented is that of the sufficiency of the evidence to support the verdict, the contention being that the evidence is not "of the character required to justify an inference of defendant's guilt of the crime charged."

The information charged defendant with the felonious concealment of 5 Guernsey cows, 4 to 6 years old; 2 Holstein cows, 6 to 8 years old; 4 Angus cows, 3, 4, 5, and 8 years old; 1 Holstein heifer, 2 years old; 1 black heifer, 2 years old; 2 white-faced heifers, 1 year old; 1 Angus bull, 2 years old; 1 roan white-faced steer; 1 Holstein steer; 5 Angus steers; 8 Holstein and Angus steers; 7 yearling mixed breed steers; all of the value of $2,800, with intent to defraud the mortgagee, Bank of Raymondville, under a chattel mortgage covering such property and given to that bank by defendant and his wife April 9, 1962, to secure their note in sum $2,756.75.

E. L. Daugherty, cashier and loan officer of the Bank of Raymondville, testified that his first dealings with appellant occurred February 10, 1962, when he made appellant a personal loan of $300. On March 2, 1962, appellant obtained a loan of $1,250 which paid the $300 loan. On March 26, 1962, appellant obtained a loan of $1,756.75 and pledged 22 head of mixed cattle as security. On April 9, 1962, appellant obtained a loan of $2,756.75 which paid the $1,756.75 loan and provided an additional $1,000 needed for the purchase of some cattle in Iowa. This last loan was represented by a 6-months' term note and was secured by a chattel mortgage on 38 head of unmarked cattle generally described as above in the information. The mortgage was executed by appellant and his wife and was recorded in the office of the Recorder of Deeds for Texas County, Missouri, April 12, 1962. It did not specify where the cattle were located.

The purchase of cattle in Iowa took place March 6, 1962, from the Iowa City Sales Company and it involved 24 cattle costing $2,762.59. According to witness Herman Pottebaum, he furnished $2,762.59 for the Iowa purchase and appellant gave him a note dated March 9, 1962. Mr. Pottebaum understood that appellant was to secure the loan by giving a mortgage on 32 head of cattle, 8 of which were supposed to be on the place where appellant lived near Simmons and 24 of which were in the Iowa sale yard. Witness Pottebaum testified also that on an occasion between the 10th and 20th of

March, 1962, he went to a place near Simmons about a quarter of a mile from where appellant lived, and earmarked 1 black horse and 32 head of cattle which he described as 2 Angus cows, one 10 and one 8 years old; 1 Angus cow, 3 years old; 1 Angus cow, 6 years old; 2 roan cows, 3 years old; 1 roan redneck cow, 4 years old; 1 roan mottle-faced cow, 6 years old; 1 Guernsey cow, 4 years old; 2 Guernsey cows, 5 years old, 1 Guernsey cow, 10 years old; 1 Guernsey cow, 4 years old; 1 Guernsey cow, 5 years old; 2 Holstein cows, 5 and 6 years old; 1 Hereford steer calf, 300 pounds; 1 Angus bull, 350 pounds; 4 Angus steer calves, 250 pounds; 1 Holstein calf, 275 pounds; 1 Holstein heifer yearling, 500 pounds; 1 black white-faced ring-eyed steer calf, 250 pounds; 1 black heifer calf, 150 pounds; 1 roan heifer calf, 160 pounds; 1 roan Guernsey yearling heifer, 500 pounds, 1 black-faced brown heifer yearling, 500 pounds; 1 Hereford mottle-faced heifer yearling, 500 pounds; 1 Hereford heifer, year and a half, 515 pounds; 1 Hereford heifer yearling, 350 pounds. This was all the cattle that appellant was supposed to own at the time. The earmarking was done by taking a little piece out of the top of each ear of the cattle which is called "overbit." Several days went by without appellant executing the chattel mortgage promised to Pottebaum, and then he learned that the cattle were mortgaged to the Raymondville bank. On April 18, 1962, he sued appellant, and Earl Hutcheson, Deputy Sheriff of Texas County, attempted to obtain service on appellant.

In the first part of May, 1962, witness Jim Wells told appellant that some of appellant's cattle were on the Wells property which was south of the Johnson farm leased by appellant. There were 12 to 15 cattle on the Wells place. "* * * they was two or three pretty old 'shally' cows, and they was some good stuff. * * * there wasn't nothing there under a yearling, from that on to old cows. * * * they was one Holstein that I can recall, and the rest of them were blacks. * * * they had an earmark, and I've seen them on the other place * * *. They come from the north. * * * He come and got them the next day."

Payton Smyers testified that he owned a place which cornered with the Johnson place, and that in May, 1962, he saw appellant put in a cattle guard at the southeast corner of the Johnson place. Appellant told the witness that he had leased the Johnson farm. During the summer the witness fished the Piney River a number of times near the Johnson farm and counted fifteen head of Stoner cattle on the Johnson farm. He also saw nine of them in his garden twice on the same day. "There was Holsteins, swayback Jerseys * * * just a—mixed herd of—of cattle." The other cattle and calves did not get in the garden. The cattle got out twenty times but fifteen head was the most he saw.

Nettie Juanita Akeman testified that she rented a 40-acre fenced part of her 200-acre Tottingham farm to appellant in the summer of 1962. She saw him bring two or three head of black cows or calves to the place. Later he brought an old, thin cow and two smaller calves. She never did see over five or six cows, "all black ones," and he came and got them later. She did not notice whether the cattle were earmarked. Appellant was out there later to report some cattle missing and was to come back to look for them. He never returned for the search, but her own boys and Dan Coates went over the place and did not see any cattle. Her son, Donald Tottingham, testified that he saw two cows and two calves on his mother's place which belonged to appellant. He helped appellant put one cow and one calf there. Four head was the most cattle appellant ever had there. The fence was in good shape and he saw no place where cattle had gone through or jumped the fence.

Doyle Van Genderen was on the Tottingham farm in September, October, and November, 1962, to cut hay on a tract adjacent

to that rented to appellant by Mrs. Akeman. He never saw but two or three old Angus cows and a couple of calves and the hayfield lay next to the only water on the farm.

Several conversations took place between Mr. Daugherty and appellant during the time following execution of the note and chattel mortgage and the fall of 1962. On one occasion following an injury to appellant, appellant said he would probably need an extension and that he would have to get the cattle up because they had strayed. The injury occurred in early September. In that conversation, appellant said the cattle were on the Tottingham farm. On October 13, 1962, appellant told witness Daugherty that the cattle had strayed on the Tottingham farm but that he could see them and was having trouble getting them up because they were wild. On that date the bank extended the note upon payment of interest due. The witness went on a combined business trip and quail hunt in the vicinity of the Tottingham farm on the 10th and 15th of November and saw no cattle. The note was never paid.

Mrs. Delta Krewson testified that on July 2, 1962, appellant sold two white-faced heifers to the Licking Livestock Auction Company which brought $174.78, and that on July 9, 1962, he sold the company a black cow and calf for $146.37 net. Merle Smith testified that on October 18, 1962, appellant sold a black steer for $88.35 and a Holstein heifer for $87.50 at the Summersville Livestock Barn.

Earl Hutcheson, Deputy Sheriff of Texas County, testified to a telephone conversation on November 26, 1962, in which appellant stated he had some cattle that had strayed or had been stolen from the Tottingham farm. The witness did not look for any cattle on the Tottingham farm because appellant told him that he had been there on his horse and they were not there.

Appellant placed advertisements in The Cabool Enterprise on November 29, 1962, and December 6, 1962, which said: "Strayed, 12 Angus cows and calves, 1 dry Angus cow and 9 Holstein cows, from Tottingham farm at Bado several weeks ago. If seen, notify Rock Stoner, Cabool, Missouri, or 'phone 58J1."

Appellant commenced bankruptcy proceedings in January, 1963, and in his schedule stated under oath that he had "22 head of cattle strayed or stolen from pasturage north of Cabool, Missouri." At another place in the schedule he stated that "1 Jersey cow, 21 or 22 Angus and Hereford unregistered stock lost or strayed or stolen from pasturage North of Cabool, Mo., mortgaged to Bank of Raymondville." Appellant later amended his bankruptcy schedule to show thirty-eight head of cattle mortgaged to Bank of Raymondville lost, strayed, or stolen, and a further amendment showed fifty-five cattle in all. The trustee in bankruptcy was able to trace the cattle to the time of appellant's injury and then they disappeared, except for two which were sold to pay interest, one which died, and one which had been put in appellant's deep freeze.

Bette Stoner, wife of appellant, testified that it was her judgment that appellant purchased 27 cattle after the April 9th purchase and she did not know whether appellant sold any of the mortgaged cattle—"I never caught him at it." She aided her recollection by canceled checks and testified to purchases by appellant of a bull and heifer for $174.97 from Cabool Livestock Sales, Inc., a heifer and calf for $90.00 from Charles McKee, and 3 heifers for $138.60 from Nolan Hutchison. She testified also to purchases from Bill E. Jones and John Fuller amounting to $250 each, and of 12 cows and 4 calves from Gene McClung of Little Rock, Arkansas, for $900. Appellant and his wife also ran a saddle shop which they closed in January, 1963. They then moved to Springfield and she could not remember the location of any cattle at the time of the move. She did not know what happened to the Bank's cattle.

Delmar Poe stated that he rented 38 acres to appellant beginning September, 1962; that the greatest number of cattle he ob-

served on the place was five or six, and when appellant moved he left but one cow, a "milk type" in poor condition.

The facts have been stated in the light most favorable to the state as is the rule in determining the sufficiency of the evidence. State v. Walker, Mo., 365 S.W.2d 597, 599 [2]. In that light, the circumstances pointing to guilt are the loose handling and transfer of cattle from place to place, appellant's unfulfilled promise to Herman Pottebaum to mortgage some cattle as security for a loan from Pottebaum, the sales of some cattle during the term of the Bank's note, the bankruptcy proceeding, and the failure to locate and account for the cattle listed on the Bank's mortgage. However, where, as in this case, the conviction must stand, if at all, on circumstantial evidence, the circumstances must be consistent with each other and with the hypothesis of defendant's guilt, and inconsistent and irreconcilable with his innocence, and must point so clearly to guilt as to exclude every reasonable hypothesis of innocence. State v. Walker, supra, 365 S.W.2d 601 [5]; State v. Murphy, 356 Mo. 110, 201 S.W.2d 280, 282 [2]. Under this test, the inferences drawn above would be justified, but they are not sufficient to establish guilt beyond a reasonable doubt. In order to convict appellant, it would be necessary to show that he actually took steps to conceal the specific mortgaged cattle for the purpose of defrauding the Bank of Raymondville, and the evidence does not permit such inferences. The evidence shows only that appellant mortgaged some cattle which were neither marked nor specifically described. He was not obliged to keep them at any certain place, and the evidence of their whereabouts and handling is as consistent with a theory that the cattle strayed into rough country as it is with a theory that the cattle were hidden with fraudulent intent. Likewise, the sales are of cattle so generally described that they cannot be traced definitely to the mortgage and an intent to violate its terms. The proceeds of a sale of one of the mortgaged animals went to pay the interest on the note at the time the note was extended, and such is inconsistent with an intent to defraud. The facts and circumstances thus raise at most a suspicion of guilt and a verdict so based on surmise, conjecture, or suspicion cannot stand. State v. Murphy, supra, 201 S.W.2d 2d 282 [3, 4]; State v. Schrum, 347 Mo. 1060, 152 S.W.2d 17, 20 [4]. There being a lack of substantial evidence of appellant's guilt, his motion for acquittal should have been sustained.

Accordingly, the judgment is reversed and, since it does not appear that a submissible case might be made upon retrial, the defendant is ordered discharged.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.